425 F.2d 10
 Raymond SCOVILLE, a minor, and Merrill Scoville, as father and next friend; Arthur Breen, a minor, and Jerry Breen, as father and next friend, Plaintiffs-Appellants,
v.
BOARD OF EDUCATION OF JOLIET TOWNSHIP HIGH SCHOOL DISTRICT 204, COUNTY OF WILL, STATE OF ILLINOIS, Arthur L. Bruning, David R. Ross, Howard Johnson and Clayton Wintersteen, Defendants-Appellees.
 No. 17190.
 United States Court of Appeals, Seventh Circuit.
 April 1, 1970.
 
 Paul M. Lurie, David C. Long, Chicago, Ill., for appellants.
 Richard T. Buck, Joliet, Ill., for appellees.
 Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, KILEY, FAIRCHILD, CUMMINGS and KERNER, Circuit Judges, en banc.
 KILEY, Circuit Judge.
 
 
 1
 The plaintiffs, minors, were expelled from high school after writing, off the school premises, a publication which was distributed in school and which contained, among other things, material critical of school policies and authorities. This civil rights action was brought for declaratory judgment, injunctive relief, and damages,[1] alleging violation of First and Fourteenth Amendment rights, as well as an unconstitutional application of an Illinois statute. The district court dismissed the suit for failure to state a claim upon which relief could be grant-A panel of this court, in an opinion (one judge dissenting) issued September 25, 1969, affirmed the district court's judgment dismissing the complaint. Subsequently, this court granted plaintiffs' petition for rehearing en banc. We now reverse the district court's judgment and remand for further proceedings.
 
 
 2
 The plaintiffs are Raymond Scoville and Arthur Breen, students at Joliet Central High School, one of three high schools administered by the defendant Board of Education. Scoville was editor and publisher, and Breen senior editor, of the publication "Grass High." They wrote the pertinent material. "Grass High" is a publication of fourteen pages containing poetry, essays, movie and record reviews, and a critical editorial. Sixty copies were distributed to faculty and students at a price of fifteen cents per copy.
 
 
 3
 On January 18, 1968, three days after "Grass High" was sold in the school, the dean advised plaintiffs that they could not take their fall semester examinations. Four days thereafter plaintiffs were suspended for a period of five days. Nine days after that Scoville was removed as editor of the school paper, and both he and Breen were deprived of further participation in school debating activities.
 
 
 4
 The dean then sent a report to the superintendent of the high schools with a recommendation of expulsion for the remainder of the school year. The superintendent wrote the parents of plaintiffs that he would present the report, together with the recommendation, to the Board of Education at its next meeting. He invited the parents to be present. Scoville's mother wrote a letter to the Board (plaintiffs' Exhibit 2, appended to the complaint) expressing plaintiffs' sorrow for the trouble they had caused, stating that they had learned a lesson, that they were worried and upset about possible interruption in their education and that the parents thought the boys had already been adequately punished. Neither plaintiffs nor their parents attended the Board meeting. The Board expelled plaintiffs from the day classes for the second semester, by virtue of the Board's authority under Ill.Rev.Stat. Ch. 122, Sec. 10-22.6 (1967), upon a determination that they were guilty of "gross disobedience [and] misconduct." The Board permitted them to attend, on a probationary basis, a day class in physics, and night school at Joliet Central. The suit before us followed.
 
 
 5
 Upon defendants' motion to dismiss, the district court decided that the complaint, on its face, alleged facts which "amounted to an immediate advocacy of, and incitement to, disregard of school administrative procedures," especially because the publication was directed to an immature audience. In other words, the court implicitly applied the clear and present danger test, finding that the distribution constituted a direct and substantial threat to the effective operation of the high school. At no time, either before the Board of Education or in the district court, was the expulsion of the plaintiffs justified on grounds other than the objectionable content of the publication. The Board has not objected to the place, time or manner of distribution. The court found and it is not disputed that plaintiffs' conduct did not cause any commotion or disruption of classes.
 
 
 6
 No charge was made that the publication was libelous, and the district court felt it unnecessary to consider whether the language in "Grass High" labeled as "inappropriate and indecent" by the Board could be suppressed as obscene.[2] The court thought that the interest in maintaining its school system outweighed the private interest of the plaintiffs in writing and publishing "Grass High." The basis of the court's decision was an editorical entitled "My Reply" (a copy of which is appended to this opinion) which — after criticizing the school's pamphlet, "Bits of Steel," addressed to parents — urged the students not to accept "in the future," for delivery to parents, any "propaganda" issued by the school, and to destroy it if accepted.
 
 
 7
 * Plaintiffs contend that the expulsion order violated their First and Fourteenth Amendment freedoms. The same cases are cited by plaintiffs and defendants in support of their arguments on this contention. The authoritative decision, pertinent to the important[3] issue before us, is Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).[4] Tinker is a high school "arm band" case, but its rule is admittedly dispositive of the case before us.[5]
 
 
 8
 The Tinker rule narrows the question before us to whether the writing of "Grass High" and its sale in school to sixty students and faculty members could "reasonably have led [the Board] to forecast substantial disruption of or material interference with school activities * * * or intru[sion] into the school affairs or the lives of others"[6] Tinker v. Des Moines School District, 393 U.S. at 514, 89 S.Ct. at 740. (Emphasis added.) We hold that the district court erred in deciding that the complaint "on its face" disclosed a clear and present danger justifying defendants' "forecast" of the harmful consequences referred to in the Tinker rule.
 
 
 9
 Tinker announces the principles which underlie our holding: High school students are persons entitled to First and Fourteenth Amendment protections. States and school officials have "comprehensive authority" to prescribe and control conduct in the schools through reasonable rules consistent with fundamental constitutional safeguards. Where rules infringe upon freedom of expression, the school officials have the burden of showing justification. See also Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966); Blackwell v. Issaquena Co. Board of Education, 363 F.2d 749 (5th Cir. 1966); Soglin v. Kaufman, 418 F.2d 163 (7th Cir. Oct. 24, 1969); Breen v. Kahl, 419 F.2d 1034 (7th Cir. Dec. 3, 1969); Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D.Ala.1967); Jones v. State Board of Education, 279 F.Supp. 190 (M.D. Tenn.1968). There is no dispute here about the applicable principles or decisional rules.
 
 
 10
 Plaintiffs' freedom of expression was infringed by the Board's action, and defendants had the burden of showing that the action was taken upon a reasonable forecast of a substantial disruption of school activity. No reasonable inference of such a showing can be drawn from the complaint which merely alleges the facts recited in the beginning of this opinion. The criticism of the defendants' disciplinary policies and the mere publication of that criticism to sixty students and faculty members leaves no room for reasonable inference justifying the Board's action. While recognizing the need of effective discipline[7] in operating schools, the law requires that the school rules be related to the state interest in the production of well-trained intellects with constructive critical stances, lest students' imaginations, intellects and wills be unduly stifled or chilled. Schools are increasingly accepting student criticism as a worthwhile influence in school administration.[8]
 
 
 11
 Absent an affirmative showing by the defendants, the district court, faced with the motion to dismiss, inferred from the admitted facts in plaintiffs' complaint and the presented exhibits that the Board action was justified. However, the district court had no factual basis for, and made no meaningful application of, the proper rule of balancing the private interests of plaintiffs' free expression against the state's interest in furthering the public school system. Burnside v. Byars, 363 F.2d at 748. No evidence was taken, for example, to show whether the classroom sales were approved by the teachers, as alleged; of the number of students in the school; of the ages of those to whom "Grass High" was sold; of what the impact was on those who bought "Grass High"; or of the range of modern reading material available to or required of the students in the school library. That plaintiffs may have intended their criticism to substantially disrupt or materially interfere with the enforcement of school policies is of no significance per se under the Tinker test.
 
 
 12
 The "Grass High" editorial imputing a "sick mind" to the dean reflects a disrespectful and tasteless attitude toward authority. Yet does that imputation to sixty students and faculty members, without more, justify a "forecast" of substantial disruption or material interference with the school policies or invade the rights of others? We think not. The reference undoubtedly offended and displeased the dean. But mere "expressions of [the students'] feelings with which [school officials] do not wish to contend" (Tinker v. Des Moines School District, 393 U.S. at 511, 89 S.Ct. at 739; Burnside v. Byars, 363 F.2d at 749) is not the showing required by the Tinker test to justify expulsion.
 
 
 13
 Finally, there is the "Grass High" random statement, "Oral sex may prevent tooth decay." This attempt to amuse comes as a shock to an older generation. But today's students in high school are not insulated from the shocking but legally accepted language used by demonstrators and protestors in streets and on campuses and by authors of best-selling modern literature. A hearing might even disclose that high school libraries contain literature which would lead students to believe the statement made in "Grass High" was unobjectionable.[9]
 
 
 14
 We believe the discussion above makes it clear, on the basis of the admitted facts and exhibits, that the Board could not have reasonably forecast that the publication and distribution of this paper to the students would substantially disrupt or materially interfere with school procedures.
 
 II
 
 15
 The sole authority for the Board's action is Ill.Rev.Stat. Ch. 122, Sec. 10-22.6 (1967), which gives the School Board the power "to expel pupils guilty of gross disobedience or misconduct." In view of our conclusion that the complaint "on its face" discloses an unjustified invasion of plaintiffs' First and Fourteenth Amendment rights, it follows that we agree with plaintiffs that the Board applied the Illinois statute in an unconstitutional manner.
 
 
 16
 We conclude that absent an evidentiary showing, and an appropriate balancing of the evidence by the district court to determine whether the Board was justified in a "forecast" of the disruption and interference, as required under Tinker, plaintiffs are entitled to the declaratory judgment, injunctive and damage relief sought.
 
 
 17
 The cause is remanded for further proceedings.
 
 
 18
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 The period of expulsion has ended and plaintiffs were readmitted to Joliet Central High School as seniors for the school year 1969-70. This fact renders moot the question of injunctive relief against the Board of Education's order. Remaining are the questions of declaratory judgment, injunctive relief with respect to restraining defendants from sending information of the expulsion to colleges and prospective employers of plaintiffs, and with respect to expunging the expulsions from the school record
 
 
 [2]
 The Board found sufficient to justify expulsion that the action of plaintiffs
 (1) constitutes a public use of inappropriate and indecent language, (2) constitutes a violation of established rules of said school district, (3) constitutes a disregard of and contempt for the authorities charged with the administration of said Central Campus and said school district, (4) encourages the disregard and disobedience of orders promulgated by the duly constituted authorities of said Central Campus and said school district, (5) involves other students as parties to the preparation and distribution of the aforesaid writing who were in fact not parties thereto.
 Board resolution, plaintiffs' Exhibit 3, appended to the complaint.
 There is a risk with respect to (4) above. "But our Constitution says we must take this risk." Tinker v. Des Moines School District, 393 U.S. 503, 508, 89 S.Ct. 733, 737 (1969).
 The Board relied upon an unwritten policy which was presumably applied ex post facto to the plaintiffs.
 
 
 [3]
 "High school underground newspapers are spreading like wildfire in the Chicago area."High School Students Are Rushing into Print — and Court, Nation's Schools, Jan. 1969, p. 30. See also Nahmod, Black Arm Bands and Underground Newspapers: Freedom of Speech in the Public Schools, 51 Chicago Bar Record 144 (Dec. 1969).
 
 
 [4]
 The Supreme Court decision inTinker was not filed until after the district court decided the case before us and after plaintiffs' original brief was filed. Tinker was cited and discussed in defendants' brief and in plaintiffs' reply brief.
 
 
 [5]
 The closest case factually which gives support to plaintiffs is the university publication case of Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D.Ala.1967) — also decided beforeTinker. The fact that it involved a university is of no importance, since the relevant principles and rules apply generally to both high schools and universities.
 We think the district court should not have been too concerned over the immaturity of the student readers of "Grass High." Professor Charles Alan Wright has noted, however: "It is likely that the tolerable limit for student expression in high school should be narrower than at college or university level." Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1052, 1053 (1969).
 
 
 [6]
 This "forecast" rule is an extension of the "substantial disruption or material interference" rule applied in the leading decision of Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966), in favor of students, and in Blackwell v. Issaquena Co. Board of Education, 363 F.2d 749 (5th Cir. 1966), against students' conduct
 
 
 [7]
 Ill-considered suppression carries its own dangers. For example, in Blackwell v. Issaquena Co. Board of Education, 363 F.2d at 751, it is said that three students wore the challenged freedom buttons on Friday. They were taken to the principal who ordered the buttons removed. The three refused to do so and were suspended. On Monday 150 students wore the buttons
 
 
 [8]
 The Harvard Law Review states "[R]esponsible student criticism of university officials is socially valuable since in many instances the students are peculiarly expert in campus issues and possess a unique perspective on matters of school policy."Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1130 (1968). Prudent criticism by seventeen-year-old high school juniors may also have value.
 
 
 [9]
 See Nahmod,Black Arm Bands and Underground Newspapers: Freedom of Speech in the Public Schools, 51 Chicago Bar Record, 144, 152 n. 4 (Dec. 1969).
 
 
 
 19
 CASTLE, Senior Circuit Judge (dissenting).
 
 
 20
 I find myself constrained to disagree with the majority's conclusion that Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, and the other cases relied upon, dictate that in the circumstances of this particular case an evidentiary hearing was a prerequisite to the District Court's implicit finding and conclusion that the disciplinary action taken by the school board was justified. Here, there was admitted action by the minor plaintiffs, through the medium of their publication "Grass High", calling upon their fellowstudents to flaunt the school's administrative procedure by destroying, rather than delivering to their parents, materials delivered to the students for the latter purpose.
 
 
 21
 I perceive no occasion here for the court to hear evidence bearing on the actual or likely success or effect of such advocacy as a prerequisite to a "balancing of the private interests" of these adolescent plaintiffs' "free expression" against the state's interest in conducting an efficient system of public schools. In my view, plaintiffs' advocacy of disregard of the school's procedure carried with it an inherent threat to the effective operation of a method the school authorities had a right to utilize for the purpose of communicating with the parents of students.
 
 
 22
 I would affirm the judgment of the District Court.
 
 APPENDIX
 MY REPLY
 
 23
 Recently, we students at Joliet Central were subjected to a pamphlet called "Bits Of Steel." This occurrence took place a few weeks before the Christmas vacation. The reason why I have not expressed my opinions on this pamphlet before now is simple: being familiar with the J-HI Journal at Central, I knew that they would not print my views on the subject.
 
 
 24
 In my critique of this pamphlet I shall try to follow the same order in which the articles were presented.
 
 
 25
 The pamphlet started with a message from the principal, David Ross. This is logical because the entire pamphlet is supposed to be "The Principal's Report to Parents." In this article Ross states why the pamphlet was put out and the purpose it is supposed to accomplish, namely, the improvement of communication between parents and administration. He has to be kidding. Surely, he realizes that a great majority of these pamphlets are thrown away by the students, and in this case that is how it should have been. I urge all students in the future to either refuse to accept or destroy upon acceptance all propaganda that Central's administration publishes.
 
 
 26
 The second article told about the Human Relations committee which we have here at Central. It told why the committee was assembled and what its purpose is. It also listed the members of the committee who attend school here at Central. All-in-all this was probably the best article in the whole pamphlet, but never fear the administration defeated its own purpose in the next article which was a racial breakdown of the Central campus. As far as I could see this article served no practical purpose. By any chance did the administration feel that such a breakdown would improve racial relations? I think not. This article had such statements as: Spanish American students were included with the white students. Well, wasn't that nice of the administration. In other words, the only difference noted was whether the student was white or Negro.
 
 
 27
 This was followed by an article called "Did you Know?" This was, supposedly, to inform the parents of certain activities. Intertwined throughout it were numerous rules that the parents were to see their children obeyed. Quite ridiculous.
 
 
 28
 Next came an article on attendance. There's not much I can say about this one. It simply told the haggard parents the utterly idiotic and asinine procedure that they must go through to assure that their children will be excused for their absences.
 
 
 29
 Question from the parents was the next in the line of articles. This consisted of a set of three questions written by the administration and then answered by the administration. The first question was designed to inform the reader about the background of the new superintendent. The second was about the paperbacks which were placed in the dean's office. They state that the books were put there "so that your sons and daughters may read while they wait. The hope is that no moment for learning will be lost." Boy, this is a laugh. Our whole system of education with all its arbitrary rules and schedules seems dedicated to nothing but wasting time. The last question concerned the Wednesday Que-ins. It was followed by a quote: "Sometimes we, parents and schoolmen must seem cruel in order to be kind to the children placed in our care." Do you think that the administration is trying to tell us something about the true purpose of the Wednesday Que-ins?
 
 
 30
 The next gem we came across was from our beloved senior dean. Our senior dean seems to feel that the only duty of a dean or parent is to be the administrator of some type of punishment. A dean should help or try to understand a student instead of merely punishing him. Our senior dean makes several interesting statements such as, "Proper attitudes must be part of our lives and the lives of our children." I believe that a person should be allowed to mold his own attitudes toward life, as long as they are not radically anti-social, without extensive interference from persons on the outside, especially those who are unqualified in such fields. Another interesting statement that he makes is "Therefore let us not cheat our children, our precious gifts from God, by neglecting to discipline them!" It is my opinion that a statement such as this is the product of a sick mind. Our senior dean because of his position of authority over a large group of young adults poses a threat to our community. Should a mind whose only thought revolves around an act of discipline be allowed to exert influence over the young minds of our community? I think not. I would urge the Board of Education to request that this dean amend his thinking or resign. The man in the dean's position must be qualified to the extent that his concern is to help the students rather than discipline or punish them.
 
 
 31
 This pamphlet also contained an article from the freshman dean. I should like to say that Dean Engers, in his article, shows a great deal of promise. He appears to be genuinely interested in the problems of the students entrusted to him. All I can say to him is to keep up the good work.
 
 
 32
 The last thing of any interest in the pamphlet was about the despicable and disgusting detention policy at Central. I think most students feel the same way as I about this policy. Therefore I will not even go into it.
 
 
 33
 In the whole pamphlet I could see only one really bright side. We were not subjected to an article written by Mr. Diekelman.
 
 
 34
 Senior Editor
 Grass High