Justin J. BOUCHER, Plaintiff–Appellee,

v.

SCHOOL BOARD OF THE SCHOOL DISTRICT OF GREENFIELD, Defendant–Appellant.

No. 97–3433.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1997.

Decided Jan. 9, 1998.

Peter Koneazny, American Civil Liberty Union of Wisconsin, Milwaukee, WI, F. Thomas Olson (argued), Hall, Patterson & Charne, Milwaukee, WI, for Plaintiff–Appellee.

K. Michael Cooley (argued), Whyte, Hirschboeck & Dudek, Milwaukee, WI, for Defendant–Appellant.

Before CUDAHY, FLAUM, and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

*The Last* is not your father's newspaper. At Greenfield High School near Milwaukee (Greenfield), it is also not your Official School Newspaper; it happens to be your underground newspaper. *The Last* features anonymous articles deployed in a potpourri of typefaces. The inaugural issue, dated April 1997, provocatively explained that *The Last* was intended to "ruffle a few feathers and jump-start some to action." In an introduction, *The Last* explained its commitment to "Free Speech" this way: "*No* censorship is impossible to achieve and wouldn't make for a very good paper, so we'll settle for a *mini-mum* of censorship. We will accept anything so long as it has some point or at least some interesting quality." The June issue of *The Last* was distributed on June 4, 1997, in bathrooms, in lockers and in the cafeteria at Greenfield. The June *Last* included an article entitled "So You Want To Be A Hacker," that purported to "tell everyone how to hack the school[']s gay ass computers." Written by self-professed "hackers with anarchistic views," it described how to "restart the computer.... to exit whatever you were doing very quickly" and how to "enter the computer[']s setup utility." Regarding the latter, the article advised, "[T]he school isn't all that smart so the password should be real easy to guess or crack." The article also explained how to "see a list of every file on the computer.... see all the students['] login names" and "see all of the teachers['] log in names." The article offered a further tip about passwords:

> Some commonly used passwords at very stupid schools are: first names, last names, ghs, ghsteacher, williefred, hacker, teacher, and password. Remember that these won't always work and they probably won't but they're a good starting point when you[']r[e] guessing.

The article described the procedure for accessing the ".com or .exe files" which "include all of the programs." It pointed out how to view a list of the users currently active on the computer network and advised, "If a teacher is on or YoungM or sysop or ghs or admin are on then I would suggest not doing any hacking because you might get caught." The article promised readers that "when you have mastered all this shit I'll be happy to teach you more." The article concluded with some final warnings and disclaimers. One stated that "if you are a fucking idiot and get caught Sacco and Vanzetti and any publishers or distributors of 'The Last' will not be held responsible." Then, "as a warning of what can happen if you get caught," the article related how "three hackers, we can't use their real names so we'll just call them Adam D., Brian R., and Justin B, were all accused of doing evil shit on the computers." The moral? "[B]e careful and remember that when you're in

the computer lab they can trace you and everyone is watching you." One part of the article was devoted to "Hacker Ethics," with the general theme that hackers "may do things which are deemed illegal but we never do things which we believe are immoral."

Although the article "So You Want To Be a Hacker," appeared under the byline "Sacco and Vanzetti," Greenfield quickly determined that it was actually the work of a single author, the plaintiff Justin J. Boucher, who was completing his junior year at Greenfield.[1] On June 6, 1997, 15 school days short of the end of the academic year, the author was suspended. The Greenfield School District administration recommended that Boucher be expelled because the article had endangered school property. The defendant, the Greenfield School District School Board (the Board), conducted a student expulsion hearing on July 10, 1997. At the conclusion of the hearing, the Board (with one member absent) voted unanimously to expel Justin Boucher immediately, until August 27, 1998.

Boucher promptly filed a two-count complaint in Wisconsin Circuit Court. Count I accused the Board of violating Boucher's "right under the First Amendment by impermissibly infringing upon the plaintiff's right to speak freely on the subject of computer use and hacking." Count II asserted that the expulsion violated Article I, § 3 of the Wisconsin Constitution.[2] The complaint requested that the expulsion order of July 10, 1997, be set aside, that the expulsion be declared to violate the Federal and State Constitutions, that costs and attorney's fees be awarded and that the court provide such other and further relief it deemed appropriate. The complaint was accompanied by a motion for a preliminary injunction against enforcement of the expulsion order.

The Board filed a notice of removal in federal district court on August 28, 1997, and, after removal, Boucher renewed his motion for a preliminary injunction. On September 2, the district court conducted a telephonic status conference during which the parties agreed that the preliminary injunction motion would be decided on the basis of written submissions and stipulated facts, without an evidentiary hearing. On September 19, the day after oral argument, the district court issued a decision and order granting the motion for a preliminary injunction. It instructed the Board to "immediately cease enforcement" of the expulsion order. The Board filed a notice of appeal on September 22, 1997, and, on September 26, a motion with the district court to suspend or modify the preliminary injunction. The district court conducted a hearing on that motion on October 1 and denied it the same day. On November 11, 1997, we denied the Board's request for a stay pending appeal. We now vacate the preliminary injunction.

 "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Mazurek v. Armstrong,* —— U.S. ——, ——, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (per curiam) (quoting 11A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed.1995) (emphasis added and footnotes omitted)). An injunction is an equitable remedy warranted only when the plaintiff has no adequate remedy at law, such as monetary damages. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 2035–36, 119 L.Ed.2d 157 (1992); *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 75–76, 112 S.Ct. 1028, 1037–38, 117 L.Ed.2d 208 (1992). As an initial matter, the

1. Nicola Sacco and Bartolomeo Vanzetti were immigrant anarchists convicted of the murder of a paymaster and guard in 1920 and sentenced to death. *See Commonwealth v. Sacco,* 255 Mass. 369, 151 N.E. 839 (1926). Their case stirred firestorms of protest but they went to their deaths, martyrs to many. *See* Felix Frankfurter, *The Case of Sacco and Vanzetti* (1927).

2. That provision of the Wisconsin Constitution provides in relevant part:

> Every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press.

Wis. Const. Art. I § 3. As far as we can tell, the Wisconsin constitutional claim has not been addressed by the parties or the district court, and therefore plays no part in our disposition of this appeal.

plaintiff must demonstrate (1) a " 'better than negligible' chance of succeeding on the merits," *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114–15 (7th Cir.1997) (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir.1988)), and (2) the inadequacy of legal remedies, *id.* at 1114. If the plaintiff makes a satisfactory showing of both of these requisites, the district court proceeds to balance the harm the injunction would impose on the defendant against the injury the plaintiff would suffer without the injunction. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir.1994). In this balancing, each party's potential injury must be adjusted for the probability that that party will prevail on the merits. For example, the less likely it is the plaintiff will prevail on the merits, the greater the harm the plaintiff would have to suffer to justify an injunction. The court must also take into account the public interest in granting or denying the motion. *See id.*

■ We derive our jurisdiction over this interlocutory appeal from 28 U.S.C. § 1292(a)(1). Our review of the grant of a preliminary injunction is confined to "whether the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *see also University of Texas v. Camenisch*, 451 U.S. 390, 393, 101 S.Ct. 1830, 1832–33, 68 L.Ed.2d 175 (1981) (indicating applicable standard supplied by reviewing-circuit precedent). A district court abuses its discretion when it grants an injunction because of "an erroneous view of the law or ... a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990); *see also Vencor*, 33 F.3d at 844.

The district court made its decision on the basis of stipulated facts, the parties' briefs and oral argument. The stipulations included the transcript of the expulsion hearing and the administration's exhibits filed in that proceeding.

■ At the expulsion proceeding, after hearing testimony by Greenfield's principal, its technology support specialist, the plaintiff and a technology consultant speaking at the plaintiff's request and reviewing the exhibits (including Boucher's article), the Board concluded that the article "provided instruction to the public and unauthorized persons on how to access the school district computer programs and disclosed restricted access information to the school district's computers" in violation of Wisconsin's computer crimes law, Wis. Stat. § 943.70(2);[3] the Board policy on the use of Greenfield's computers, computer network and the Internet; and "general school rules for behavior and communications by its students with its computers." The Board found that "Justin wrote the article outside the school" and it "then appeared with his knowledge ... for distribution at school," and that this endangered school property. The Board resolved that this conduct demanded the ultimate school sanction: expulsion.

In support of the motion for a preliminary injunction, Boucher argued that he had a reasonable probability of succeeding on the merits, that he would suffer irreparable and incalculable harm from being prohibited from attending Greenfield and graduating with his class and that permitting him to begin his senior year pending a decision on the merits would impose only a slight burden on the Board. In handicapping his own chances on the merits, Boucher argued that his article was "mere advocacy," which was protected under the First Amendment. *See Brandenburg v. Ohio*, 395 U.S. 444, 449, 89 S.Ct. 1827, 1830–31, 23 L.Ed.2d 430 (1969) (per curiam). He noted that the Supreme Court has reiterated that the First Amendment (via the

---

**3.** The law provides, in relevant part:

Offenses against computer data and programs. (a) Whoever wilfully, knowingly and without authorization does any of the following may be penalized as provided in par. (b): ... (6) Dis-

closes restricted access codes or other restricted information to unauthorized persons.
(b) Whoever violates this section is guilty of: 1. A Class A misdemeanor unless subd. 2., 3. or 4. applies....
Wis.Stat. § 943.70(2).

Fourteenth Amendment) applies to students in public schools:

> Students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." They cannot be punished merely for expressing their personal views on the school premises—"whether in the cafeteria, or on the playing field, or on the campus during the authorized hours"—unless school authorities have reason to believe that such expression will "substantially interfere with the work of the school or impinge upon the rights of other students."

*Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (quoting *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 506, 509, 512–13, 89 S.Ct. 733, 736, 738, 739, 21 L.Ed.2d 731 (1969)) (internal citations omitted). Boucher maintained that his conduct did not violate Greenfield's policies regarding student use of its computer resources, because those policies only concerned actual tampering with and misuse of school computers; he had not been charged with improper use of the computers. He denied that he disclosed restricted access codes, and indicated that, although the Board had referred his case to the police, no criminal proceedings had been brought against him.

In opposing the injunction before the district court, the Board argued that Boucher had no reasonable likelihood of succeeding on the merits: the article was not shielded by the First Amendment because it disclosed restricted access codes in violation of Wisconsin's computer crimes law. The Board also contended that Boucher's conduct created a reasonable perception of the threat of hacking, having the potential for unauthorized access to confidential school information. During the expulsion hearing, Greenfield's technology specialist testified that someone following the article's instructions could view (and alter) students' grades and any disciplinary information entered by individual teachers. According to the Board, writing the article therefore violated Greenfield's computer policies even if it were not a criminal act.

The Board also contested Boucher's claim that he would suffer irreparable harm without the injunction, suggesting temporary alternative schooling in private schools, nearby public high schools, home schooling or schooling via the Internet. The Board claimed that it would be harmed by the injunction by being "force[d] ... to endure a demonstrably disruptive student" whose "prior retaliatory motivations against the school have likely only escalated" and would also suffer "intangible harm" because the injunction would "jeopardiz[e] the school's authority to control this type of ... conduct," Tr.Prelim.Inj.Hr'g at 28.

The district court indicated that its decision on the injunction motion would be based on (1) whether Boucher had some likelihood of success at a trial on the merits, (2) whether Boucher had an adequate remedy at law or would suffer irreparable harm without an injunction, (3) whether the irreparable harm the expulsion order would cause Boucher outweighed the irreparable harm the injunction would cause the Board, and (4) the public interest in the outcome. *See TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 881 (7th Cir.1997).

The district court concluded that Boucher had "some likelihood" of prevailing on the merits. The court observed that Boucher had not been charged with a computer crime and did not appear to have violated the statute since some of the passwords he mentioned were apparently inactive and he may have guessed the others. Therefore, according to the court, any disclosure of restricted access codes had not been shown to be wilful and knowing, a required element of the alleged computer crime. The district court was not persuaded that Boucher had violated Greenfield's computer policies: "The policies deal with computer *use;* the hearing testimony was that there was no indication that Boucher had actually *performed* any of the procedures discussed in the Article, and he was being suspended only for authoring the Article."

Citing *Ayres v. City of Chicago,* 125 F.3d 1010, 1013 (7th Cir.1997), the court correctly observed that "[e]ven if Boucher does not have a very high probability of prevailing on

the merits, if he would suffer extensive irreparable harm and the Board little harm (and no third parties would be harmed), he is entitled to a preliminary injunction." The district court agreed with Boucher that he would suffer irreparable harm because expulsion for a year "would have negative implications which cannot be seriously challenged." Turning to the potential harm to the Board from granting the injunction, the district court declared that its "review of the record finds no support for th[e] conclusory assertion" that an injunction would force Greenfield to "'endure a demonstrably disruptive student'" bent on retaliating against the school. The district court mentioned without analysis or findings the Board's concern that an injunction would undermine its disciplinary authority and pose a risk to the security of its computer system. Finally, the district court decided to grant the motion because

> [u]nder the circumstances, the one-year expulsion is an extreme response. The Board has not established that any harm it will suffer if Boucher attends school outweighs the harm to Boucher from being denied attendance at his senior year of high school.

The district court apparently concluded that the injunction would not significantly affect the public interest. Neither party addressed the public interest, although the Board now argues that the public interest coincides with its interest.[4]

■ Although the court's order of September 19, 1997, is not entirely clear, the court seemed to conclude that the Board would suffer only negligible harm from the injunction. Perhaps the court simply meant that the Board's harm with the injunction does not outweigh the injury to Boucher without one.[5] Or the court may have meant to assess the balance of harms as adjusted for the respective odds of winning on the merits. From the judge's citation of authorities and remarks in court, we believe he concluded that, even if the expulsion order's injury to Boucher were discounted significantly by an apparently modest chance of success on the merits, the discounted harm still outweighed the insignificant harm that an injunction would impose on the Board.

While the district court's statement that a year's expulsion is extreme is understandable, we cannot accept the conclusion that the harm the injunction imposes on the Board is insignificant. As the district court recognized in the October 1 hearing, see Br. & App. of Appellant at App. 31, an injunction could remain in force through the remainder of Justin Boucher's tenure at Greenfield, at which point the issue of punishment would be moot.[6] Under the circumstances, we think

4. The Board's brief notes that "the text of the [district court's] opinion is entirely devoid of any consideration as to how entry of the injunction would [a]ffect the public interest...." Br. & App. of Appellant at 22. This observation, however, applies equally to the Board's brief to the district court.

5. Although we think that this interpretation is incorrect, if the district court did mean only a weighing of the undiscounted harms, the granting of the injunction would have been an abuse of discretion. Under the circumstances of this case, it would have been an error of law for the district court to weigh the parties' harms without taking into account the likely victor on the merits, see Vencor, 33 F.3d at 845. A movant's mere showing of a non-negligible chance of success (which is all the district court recognized), together with a potential injury that does not substantially exceed the injury caused to the nonmovant by an injunction, would not support an injunction in this circuit or in any other. In those circuits, such as this one, that do not require the movant to establish that success on the merits is more likely than not, the movant

must compensate for the lesser likelihood of prevailing by showing the balance of harms tips *decidedly* in favor of the movant. See, e.g., Ayres, 125 F.3d at 1013; cf., e.g., Sweeney v. Bane, 996 F.2d 1384, 1388 (2d Cir.1993) ("A party seeking preliminary injunctive relief must establish: (a) irreparable injury and (b) either (i) a likelihood of success on the merits of the underlying claim or (ii) sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and a balance of the hardships tipping decidedly toward the movant."); Eng v. Smith, 849 F.2d 80, 82 (2d Cir.1998) (noting that in Second Circuit "likelihood of success" alternative requires showing probability of prevailing on merits exceeds fifty percent); see generally 13 James Wm. Moore, *Moore's Federal Practice* § 65.05 (3d ed.1997) (surveying circuit standards for granting preliminary injunctions); Joseph T. McLaughlin & Harmeet K. Dhillon, *Preliminary Injunctive Relief in the Federal Courts*, 540 PLI/ Lit 503 (1996) (same).

6. A preliminary injunction that would give the movant substantially all the relief he seeks is disfavored, and courts have imposed a higher

the Board is correct in characterizing the injunction as undermining the authority of the Board to take disciplinary action for what it believed to be a serious threat to school property. Boucher argues that the Board has failed to present evidence that enjoining his expulsion undermines its authority, "save the unsupported conjecture in the District Superintendent's affidavit." Br. of Pl.–Appellee at 16. But the potential harm to the Board's authority "cannot be seriously challenged." The utter defeat of the Board's disciplinary efforts when confronted by a self-proclaimed "hacker" is clearly a substantial harm. Yet the district court failed to articulate a reason for discounting this injury to the Board. It never addressed the issue. We do not believe that the district court, with its somewhat dismissive view of the Board's injury, could have struck a correct balance. Under the district court's analysis, a school often would be powerless to expel a student able to mount a nonfrivolous legal challenge to the expulsion, unless the school could prove that the student's continued attendance actually presents a current threat of tangible injury. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507, 89 S.Ct. at 737. "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *New Jersey v. T.L.O.*, 469 U.S. 325, 350, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985) (Powell, J., concurring). We think that, in this procedural posture, it is enough to show that school discipline, undertaken reasonably and in good faith to protect the school's vital interest, is being undermined.

Further, although the point is not essential to our decision, in our judgment the district court's statement that there is no evidence in support of the other, tangible harm asserted

by the Board—having to endure a "demonstrably disruptive student"—is untenable. At the expulsion hearing, Greenfield's technology expert testified that after the article appeared the school called in computer experts to conduct four hours of diagnostic tests on the computer system. The school changed all of the passwords mentioned in the article. (The diagnostic tests revealed signs of tampering, although the tampering could not be tied to the article.) This is, at a minimum, *some* evidence of past disruption, which would support an inference of potential future disruption—especially in light of the article's promise to "teach you more."

Returning, however, to the undermining of discipline, the district court's failure to credit the injunction's harm to the Board's disciplinary authority might not be decisive if Boucher were likely to win the trial on the merits. Although we need not question the district court's conclusion that Boucher has "some likelihood" of winning on the merits, on the record before us it seems more likely than not that the Board will prevail.

█ The Supreme Court has determined that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266, 108 S.Ct. at 567 (internal citations and quotation marks omitted). The Court has indicated that in the case of student expression, the relevant test is whether school authorities "have *reason to believe*" that the expression will be disruptive. *See id.* (emphasis added); *see also Tinker*, 393 U.S. at 514, 89 S.Ct. at 740 (indicating standard was the existence of "facts which might reasonably have led school authorities to forecast substantial disruption ... or material interference with school activities"). Boucher claims that a

burden on a movant in such cases. *See Selchow & Righter Co. v. Western Printing and Lithographing Co.*, 112 F.2d 430, 431 (7th Cir.1940); *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2d Cir.1997); *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991); *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir.1991); *Tanner Motor Livery, Ltd. v. Avis,*

*Inc.*, 316 F.2d 804, 808 (9th Cir.1963). Of course, whether the expulsion order becomes part of the student's record may be an issue of some importance even if an injunction prevents the school from its enforcement through the remainder of the student's high school career. *See Goss v. Lopez*, 419 U.S. 565, 575, 95 S.Ct. 729, 736–37, 42 L.Ed.2d 725 (1975).

"reason to believe" or "reasonable forecast" standard applies only in prior-restraint cases, and is "irrelevant to punishing disruption that never occurred." He suggests that, except in a prior-restraint case, the appropriate criterion is actual harm. But this court, sitting en banc, has applied the reasonable forecast standard to punishment after publication. *See Scoville v. Board of Educ. of Joliet Township High Sch. Dist. 204*, 425 F.2d 10, 13 (7th Cir.1970) (en banc) (describing standard as "a reasonable forecast of a substantial disruption of school activity"). Although in *Scoville* the court's judgment would have been the same if it had applied an "actual disruption" standard instead of a "reasonable forecast" standard—a distinction Boucher in any event ignores—on the record before us we are not persuaded that *Scoville* is distinguishable. Further, the principal case cited by Boucher for confining the reasonable forecast standard to prior restraint cases, *Shanley v. Northeast Independent School District*, 462 F.2d 960 (5th Cir.1972), concludes that the appropriate standard for analyzing the propriety of suspensions imposed after distribution of an underground student newspaper is whether "disruption actually occurred or was *reasonably foreseeable* under the circumstances." *Id.* at 975 (emphasis added); *see also id.* at 970. Remarkably, however, Boucher does not even argue to this court that disruption was not reasonably foreseeable. Under existing case law, on the record before us, a reasonable forecast of disruption is all that would be required of the Board.

The article is neither an essay on computers in the abstract nor a mere hostile critique of Greenfield High School. Instead, it purports to be a blueprint for the invasion of Greenfield's computer system along with encouragement to do just that.[7] It is a call to action detrimental to the tangible interests of the school. Although we express no judgment on the ultimate merits of the case, *see Doran*, 422 U.S. at 934, 95 S.Ct. at 2569, on the basis of the current record it appears that Greenfield was justified to interpret the article as what it purported to be. Boucher does not contend that the article was intended merely as some sort of *parody* of anarchist high school hackers[8]—a defense that might have been more promising than the ones offered. Instead, spiced with warnings, emphasizing stealth, the article's agenda is palpably transgressive. At the expulsion hearing, Boucher testified that his motive in writing the article was to increase computer literacy among students so that when, in the future, something went awry on Greenfield's computer network, the pool of suspects would be expanded beyond a very narrow one that included Boucher. If the information in the article were truly innocuous and easily perceived as such, however, it is hard to see how its dissemination could deflect attention from the usual suspects. The district court found that the article "does encourage activity which could be invasive and destructive to the School's computer system and the information on it." It is largely irrelevant that the article may not have actually (and in hindsight) provided as valuable advice as purported or that the information disclosed may not have been as secret as represented; on the facts before us a reader might reasonably take the article at face value.

Finally, Boucher argues that school officials' authority over off-campus expression is much more limited than it is over expression on school grounds. Based on the record developed so far, however, the cases cited for this proposition, *Bystrom by Bystrom v. Fridley High School Independent School District*, 822 F.2d 747, 751 (8th Cir.1987) and *Thomas v. Board of Education of Granville Central School District*, 607 F.2d 1043, 1050 (2d Cir.1979), do not appear relevant. *Thomas* involved off-campus distribution of an underground newspaper containing allegedly indecent material. The Second Circuit concluded that the expression lacked the potential to disrupt school activities. *See Thomas*, 607 F.2d at 1052 n. 17; *id.* at 1054 n. 2 (Newman, J., concurring in the result).

---

7. At the risk of jeopardizing the nation's computer security, the full text of the article is reproduced in the appendix.

8. For a discussion of possible meanings of the term "hacker," see *United States v. Riggs*, 739 F.Supp. 414, 423–24 (N.D.Ill.1990).

The statement in *Bystrom* is merely dictum distinguishing *Thomas* on the basis that in *Bystrom* an underground newspaper was distributed on school grounds. As might be expected with an underground newspaper, *The Last* is not sponsored by Greenfield, but the parties have stipulated that the article was distributed on campus. Boucher suggests that the Board's arguments, as a matter of logic, would have to be the same if the article had not been distributed on school grounds, and thus the legal analysis should also be the same. Since the article was in fact distributed on campus, however, we need not reach that issue—particularly at this stage in the case. In addition, the district court found that the article advocates on-campus activity. Thus, on the record before us, it appears the case law applicable to *student* expression will apply, making it unnecessary to consider the application of the test of *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829–30 ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.") (footnote omitted).

The preliminary injunction is VACATED. The mandate shall issue seven days after the date this opinion is issued. The filing of a petition for rehearing within seven days after the filing of this opinion will stay the mandate until disposition of the petition. If the petition is denied, the mandate shall issue immediately or, if later, after the end of the seven-day period following the issuance of this opinion, unless the time is enlarged by subsequent order of this court. *See* Fed. R.App.P. 35(c), 40(a), 41(a).

### Appendix

### SO YOU WANT TO BE A HACKER BY SACCO AND VANZETTI

We would like first to say that Sacco and Vanzetti do not publish "The Last." We are merely hackers with anarchistic views who have a little section in "The Last." Recently at our school Mrs. Authority (we can't use her real name but you should know who she is) has been harassing the hackers. We have been blamed for virii in the computers, for the printers fucking up, for changing people['s] passwords, for [W]indows going too slow and pretty much every other thing caused by Mrs. Authority's own fucking stupidity. There never was a virus in the computers. She just fucked something up and needed a scapegoat so she blamed the hackers. So we have now decided to tell everyone how to hack the school['s] gay ass computers. We hope you enjoy and remember that your parents['] tax dollars paid for those fucking computers so you have a right to know what's on them.

### Hacker Ethics

Contrary to popular belief hackers do have ethics. We may do things which are deemed illegal but we never do things which we believe are immoral. So here is your Code of Ethics that we would like all to follow with their hacking. We cannot force you to follow those rules nor would we want to be able to force anyone to do anything. We are merely asking you to follow these ethics. Thank you.

1. Never harm, alter or damage any computers, piece or software, or person in any way.

2. If damage has been done do what is necessary to correct that damage, and to prevent it from occurring in the future.

3. Inform computer managers about lapses in their security, when you're done exploiting it.

4. Teach when you are asked to teach, share when you have knowledge to spread. Remember that someone had to teach you and you would know nothing if others hadn't shared their information with you so return the favor and help the spread of hackers.

5. Be aware of potential vulnerability in all computing environments, including the ones you will enter as a hacker. Act discreetly and remember that you

are not invincible. Forgetting this is how idiots get caught.

6. Persevere, but don't be stupid and don't take greedy risks.

## On To The Hacking

We will start with the gay shit and move on to the cool shit. To restart the computer hit "control-alt-delete" all at the same time. Hit these three buttons twice to exit whatever you were doing very quickly. To enter the computer[']s setup utility restart the computer and start holding the F2 button. It may ask for a password to get in so keep guessing. Remember that the school isn't all that smart so the password should be real easy to guess or crack. To enter DOS off the network unplug the little black cable in the back that looks like a phone cable. Then restart the computer. Then you're in DOS but you can't enter any of the networked programs.

To see a list of every file on the computer go into professional write, if you don't have it log on as ST20 and go to generic then go to professional write. Now hit control-g. it should say H: but if you change it to say H:\ then hit enter you will be given a list of a bunch of cool shit. Go under students then under menus to see all the students['] login names. Go to classes to see all of the teachers['] log in names. Surely some of these names won't have passwords on them. Find a name, logout and give it a try. Some commonly used passwords at very stupid schools are: first names, last names, ghs, ghsteacher, williefred, hacker, teacher, and password. Remember that these won't always work and they probably won't but they're a good starting point when you[']r[e] guessing. To enter DOS on the network you must get to the screen where it says "hit control-a to run a floppy." Hit control-a and then hit control-c it should now say terminate batch job. Hit y then hit f. Now type in H:\ then hit enter. Now hit cd\ then hit enter. Now you can access of the .com or .exe files. These include all of the programs. To see who all is on the computers go to the DOS prompt then type in userlist now hit enter. This will tell you who is on each computer. If a teacher is on or YoungM or sysop or ghs or admin are on then I would suggest not doing any hacking because you might get caught. Some of the powerful names are: GHS, Frontdesk (this is what the library ladies use), Sysop and Admin (they are the gods on the network), youngm, any teacher, Station1, Station2, Station3, Station4, Station5, and the hackers. We are more powerful than all . . .

Well when you have mastered all this shit I'll be happy to teach you more but this is getting very long and I don't want to hog up all the room in "The Last." Remember that if you are a fucking idiot and get caught Sacco and Vanzetti and any publishers or distributors of "The Last" will not be held responsible. Just say god made me do it and they might let you off.

Recently at a school which will remain nameless three hackers, we can't use their real names so we'll just call them Adam D., Brian R., and Justin B, were all accused of doing evil shit on the computers. What was that they were doing that was so evil. Well this is pretty horrible so prepare yourself. They were trying to program computers. I know that's pretty awful they were trying to do something that can get you hired by companies but rather than help them the school saw them as a perfect scapegoat to blame their computer "experts[']" stupidity on. We can't use her name so we'll call her Mrs. Old Bitch. Now whenever this dumb bitch fucks something up these three students get blamed. We write this as a warning of what can happen if you get caught. So be careful and remember that when you're in the computer lab they can trace you and everyone is watching you.

E-mail SaccoandVanzetti@juno.com. Don't even try to trace my account to find out who I am because it's all under fake ass names and I use a modem jammer when I dial so don't even try to fuck with me. If I catch any of you saying that you made this shit up or that you're Sacco or Vanzetti I will fucking kill you and you will be the biggest lamer in the world. Until next time.