Dennis E. JONES'EL, Micha'El Johnson, De'Ondre Conquest, Luis Nieves, Scott Seal, Alex Figueroa, Robert Sallie, Chad Goetsch, Edward Piscitello, Quintin L'Minggio, Lorenzo Balli, Donald Brown, Christopher Scarver, Benjamin Biese, Lashawn Logan, Jason Pagliarini and Andrew Collette, and all others similarly situated, Plaintiffs,

v.

Gerald BERGE and Jon Litscher, Defendants.

No. 00–C–421–C.

United States District Court, W.D. Wisconsin.

Oct. 10, 2001.

Ed Garvey, Glenn M. Stoddard, Pamela R. McGillivray, Garvey & Stoddard, S.C., Madison, WI, David C. Fathi, National Prison Project of ACLU Foundation, Washington, DC, Howard B. Eisenberg, Robin Shellow, Milwaukee, WI, Micabil Diaz Martines, ACLU of WI, Milwaukee, WI, for Plaintiffs.

Stan Davis, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

Inmates on Level One at the State of Wisconsin's Supermax Correctional Institution in Boscobel, Wisconsin spend all but four hours a week confined to a cell. The "boxcar" style door on the cell is solid except for a shutter and a trap door that opens into the dead space of a vestibule through which a guard may transfer items to the inmate without interacting with him. The cells are illuminated 24 hours a day. Inmates receive no outdoor exercise. Their personal possessions are severely restricted: one religious text, one box of legal materials and 25 personal letters. They are permitted no clocks, radios, watches, cassette players or televisions. The temperature fluctuates wildly, reaching extremely high and low temperatures depending on the season. A video camera rather than a human eye monitors the inmate's movements. Visits other than with lawyers are conducted through video screens.

Most inmates have a difficult time handling these conditions of extreme social isolation and sensory deprivation, but for seriously mentally ill inmates, the conditions can be devastating. Lacking physical and social points of reference to ground them in reality, seriously mentally ill inmates run a high risk of breaking down and attempting suicide.

Plaintiffs are challenging the conditions at Supermax on behalf of all inmates in this civil action brought pursuant to 42 U.S.C. § 1983. The case is before the court now on plaintiffs' motion for a preliminary injunction focusing exclusively on the seriously mentally ill inmates. Plaintiffs contend that the conditions of confinement constitute cruel and unusual punishment under the Eighth Amendment. They seek a court order requiring defendants to (1) transfer six seriously mentally ill inmates from the institution to an inpatient psychiatric facility and (2) have an independent psychiatrist evaluate every Supermax inmate whom plaintiffs' expert psychiatrist has not already evaluated to determine whether the inmate is suffering from a serious mental illness and, if so, to transfer him to an inpatient psychiatric facility. A hearing was held on this motion on September 20, 2001. Because plaintiffs succeeded in demonstrating that they have more than a negligible chance of success on the merits and that the balance of harms weighs in their favor, I will grant their request for a preliminary injunction.

For the purpose of deciding plaintiff's motion for a preliminary injunction, I find from the parties' proposed findings of fact, the evidence presented at the hearing and the evidence submitted to the court that the following facts are undisputed. A few comments about the facts are in order. Plaintiffs did not file a response to defendants' proposed findings of fact. Therefore, I have found all of defendants' proposals to be undisputed. Defendants responded to plaintiffs' proposed findings of fact but their responses did not comply in all respects with the court's *Procedure to be Followed on Motions for Injunctive Relief.* In a number of instances, defendants responded to a proposal by saying merely that it was disputed, without citing any evidence to put the proposed fact into dispute. In those instances in which defendants' "disputes" were unsupported, I have ignored them.

## UNDISPUTED FACTS

Plaintiffs are all prisoners confined at Supermax Correctional Institution. Defendant Jon Litscher is Secretary of the Wisconsin Department of Corrections. Defendant Gerald Berge is Warden of Supermax Correctional Institution.

### I. CONDITIONS AT SUPERMAX

Supermax Correctional Institution is a 500 bed supermaximum security facility in Boscobel, Wisconsin, designed to incarcerate the worst of the worst offenders. Supermax prisoners experience limited social interaction and almost total idleness, are fed in their cells and have very limited out-of-cell activities. Almost every aspect of daily life is controlled and monitored. Remote controlled doors minimize contact even further. There is little natural light and no access to the outdoors.

Inmates at Supermax who are not serving segregation time are part of an incentive program, which operates on a "level" system. Level One is the lowest level with the most restrictive conditions of confinement. It operates out of Alpha Unit. New prisoners are assigned to Alpha Unit upon arrival at the institution and remain there for a period in which staff evaluates their program and medical needs, their behavior and their adjustment, after which they are assigned to an appropriate level. Inmates in Alpha Unit are housed in single-person cells separated from the corridor by a solid steel door, a vestibule and a second solid steel door. Officers do not walk in front of prisoners' cells unless they have a specific reason to do so. It is impossible for a prisoner in Alpha Unit to see what is happening in the area adjacent to his cell unless the shutter of his door is opened. Because of the way in which the cells are constructed, inmates have little face-to-face contact with staff. When inmates with serious mental illnesses live in cells with solid doors that open not onto a main hallway but onto a vestibule, they lack the daily informal contact that they would have in a less restrictive setting.

All of the cells at Supermax have "boxcar doors" that are constructed of solid metal. Institutions other than Supermax have some cells with boxcar doors. However, in those institutions, having a solid boxcar door is considered a hardship; inmates in cells with these doors are allowed out of their cells more often than others to compensate for the isolating effects of the cells. Because of the heavy walls and boxcar doors at Supermax, there is a constant muffled sound broken intermittently by loud yells and slamming gates.

A five-inch strip of opaque glass runs along the top edge of one wall of each cell. By standing on the bed and craning his neck, an inmate can glimpse the sky through a small sealed skylight. In general, seriously mentally ill inmates do not have the presence of mind to perform this maneuver. Inmates are not allowed to

wear watches or have clocks and it is not easy for them to gauge time from the restricted view they have of the sky.

Cells remain illuminated 24 hours a day. Inmates may change the lighting in the cells from high to low but they cannot turn it off altogether. The low setting is bright enough to read by; many inmates state that it is so bright that it disturbs their sleep. At night, inmates are required to sleep in such a way as to allow guards to see skin when they perform hourly checks of the inmates. Guards will wake inmates if they have covered their faces in such a way that the guards cannot see any of the inmate's skin. For seriously mentally ill inmates, the constant illumination disrupts their diurnal rhythm and adds to the sense of disorientation, especially when they do not know the time of day. The constant lighting creates a sense of lack of control and passivity in seriously mentally ill inmates and contributes to sleep problems and headaches that exacerbate the symptoms of mental illness.

Inmates have no way to regulate the temperature in their cells. There is no air conditioning and the solid cell doors and lack of windows prevents air from circulating. On August 9, 2001, Daniel Feldt, an industrial hygienist, monitored the temperature and humidity at Supermax when the outdoor temperature was 91 degrees. According to his report, the average cell temperature at bed height was 91.75 degrees and the average relative humidity was 59.4%. These figures produce a heat index in excess of 100 degrees. Although their cells contain showers that could provide some relief from the heat, inmates are permitted to use the showers only three times a week. For seriously mentally ill inmates, extreme heat poses special risks. This population is less likely to seek help when suffering heat-related symptoms. Those inmates taking psychotropic medications are more vulnerable to heat-related

illnesses. In the winter, the cell temperature drops to uncomfortable lows.

Inmates in Level One in Alpha Unit are allowed four hours of exercise a week in an exercise cell, which is nothing more than a slightly larger version of a regular cell. It has no windows. There is no exercise equipment of any kind although it would be possible to install equipment that would not pose a security threat to staff or inmates. The room is too small for jogging. All it will accommodate is pacing or exercises such as sit-ups or jumping jacks that inmates could do in their own cells. Inmates must be transported to the exercise cell, wearing restraints that correspond to the level determined to be appropriate for them. (As inmates progress through the level system, the level of restraint required for transportation is reduced.) Inmates are pat searched before entering the exercise cell and after leaving it. 90% of inmates refuse to go to the exercise cell, even when given permission to do so and even though exercise is one of the few reasons for which they are permitted out of their cells at Level One. This high rate of refusal is unusual among inmates kept in isolation. For seriously mentally ill inmates, recreation time is especially important. Mentally ill inmates are not necessarily literate; such inmates do not read to maintain a sense of self but need exercise, activity and time outside their cells.

Correctional officers decide when inmates will exercise. There is no regular exercise schedule; an inmate will be offered the option to exercise in the morning when his morning meal container is picked up. If he refuses exercise time, he loses it.

An inmate may choose to use the "legal starter kit" in lieu of exercise time. This is a small law library that is set up in a cell on the unit. Inmates using the legal library on Level One must be shackled and cuffed (with their cuffs attached to a belly

chain) for the entire time they are out of their cells. Although the inmates use the room one at a time, are locked in while using it and the door to the room has a trap that officers could use to unfasten the inmates' cuffs from outside while the inmates are in the library and re-fasten the cuffs when the inmate is ready to leave, inmates remain cuffed and shackled while trying to use the legal materials. This means that it is very difficult for inmates to carry books, turn pages or take notes.

Inmates are not allowed face-to-face visits, other than with their lawyers. The institution provides only video visitation. Inmates remain in their cell block and visitors at the front of the institution. Inmates and their visitors see each other on small video screens that are located across the room from the inmate. The audio quality is poor. (Defendants have represented that they would allow visitors to visit with Level Five inmates through lexon panels, starting in September 2001.) The poor quality of the visits has led some mentally ill inmates to believe that the images on the video screens are manipulated and to refuse visitors. During the video visits, inmates remain handcuffed, shackled and belly chained. Prison log books show that only 10% of inmates receive visits, an unusually low number. The low number of visitors is also a result of Boscobel's distance from Madison and Milwaukee, making it difficult for families without private transportation to make the trip to Boscobel. Visits with family are especially important for inmates with serious mental illnesses to promote stability.

Level One inmates at Supermax are allowed only one six-minute telephone call a month. They are not allowed to have any electronic equipment in their cells or to participate in any programs. Their canteen privileges are limited. Inmates in Level One are not allowed to have library books in their cells but may have one box or two shopping bags of legal materials, a soft-cover Bible or Koran or the equivalent and up to 25 letters. Sometimes a chaplain will come to the door of a cell. Inmates have no congregate activity until Level Five and then only on a case by case basis.

Inmates who start in Level One spend a minimum of 30 days there. If they move to another level and are demoted back, they must remain in Level One a minimum of 45 days before being reviewed for movement to the next level; if returned a third time, they must spend at least 60 days there before they can be evaluated for transfer to a higher level. Inmates who advance to a higher level may be demoted at any time if staff determine they have engaged in negative behavior. A review team makes the recommendation to demote or promote; it does not provide any opportunity for a hearing. Seriously mentally ill inmates have difficulty following the rules necessary to advance up the level system and, as a result, find themselves "stuck" in Levels One, sometimes Two and only rarely Three.

## II. EFFECTS OF SUPERMAXIMUM CONFINEMENT ON MENTAL ILLNESS

Confinement in a supermaximum security prison such as Supermax is known to cause severe psychiatric morbidity, disability, suffering and mortality. Prisoners in segregated housing units who have no history of serious mental illness and who are not prone to psychiatric decompensation (breakdown) often develop a constellation of symptoms known as "[Segregated Housing Unit] Syndrome." Although SHU Syndrome is not an officially recognized diagnostic category, it is made up of official diagnoses such as paranoid delusional disorder, dissociative disorder, schizophrenia and panic disorder. The extremely

isolating conditions in supermaximum confinement cause SHU Syndrome in relatively healthy prisoners who have histories of serious mental illness, as well as prisoners who have never suffered a breakdown in the past but are prone to break down when the stress and trauma become exceptionally severe. Many prisoners are not capable of maintaining their sanity in such an extreme and stressful environment; a high number attempt suicide.

## III.  EXPERT WITNESSES

Michael Sullivan has worked in the corrections field for 30 years. He began his career as a probation and parole agent, then became a field supervisor, then Deputy Secretary of the Department of Corrections and eventually Secretary of the Department of Corrections. He held that position at the time the decision was made to build Supermax Correctional Institution. Sullivan testified on behalf of plaintiffs. He believes that Supermax cannot provide an adequate placement for mentally ill inmates because it lacks the staffing to care for them and because it has little if any space for programming. He acknowledges that he is not familiar with the staffing ratios at the institution at the present time or with the program offerings but believes that no amount of programming could compensate for the physical isolation imposed on Alpha Unit. His testimony is based upon what he knew about the institution in the planning stages. It is his opinion that seriously mentally ill inmates should be placed at the Wisconsin Resource Center, a facility run by the Wisconsin Department of Health and Family Services, or in a special unit at the Columbia Correctional Institution that is designed for mentally ill inmates.

The Wisconsin Resource Center was designed as a placement for inmates who were stuck in segregation for one reason or another, including mental health problems that interfered with their ability to follow rules and make rational choices. It has a high staff to inmate ratio (3 to 1) and its staff are highly trained. By comparison, Supermax has a much lower staff to inmate ratio. It has the services of one psychiatrist for eight hours a week, two full-time and one half-time psychologists and two crisis intervention workers, who have bachelor's degrees. The Wisconsin Resource Center has the same security features as Supermax but offers rich mental health programming.

Supermax was built to respond to a perceived need by wardens for an increased number of segregation cells for dangerous and recalcitrant inmates. The wardens' first choice was to add 25 segregation cells at each of the four major adult male institutions; their second choice was a 200–bed supermaximum security facility. The governor and legislature chose to build a 500–bed prison that would serve as a segregation facility.

It is common for the Department of Corrections to transfer inmates from one institution to another; transfers occur on a daily basis. The department has a transportation unit that is dedicated to this activity and a budget for the transfer of inmates.

Plaintiffs' second expert witness was Terry Kupers, M.D., a board-certified psychiatrist and a fellow of the American Psychiatric Association. Kupers is Co–Chair of the Committee on the Mentally Ill Behind Bars of the American Association of Community Psychiatrists, a professor in the Graduate School of Psychology of the Wright Institute in Berkeley, California, a practicing psychiatrist and a consultant to several public mental health agencies and to the United States Department of Justice, Civil Rights Division.

Kupers visited Supermax on July 26, 27 and 28, 2001, together with Vincent Nathan (another expert witness employed by

plaintiffs) and counsel for both parties. He toured the entire physical plant, including the administration building, and entered cells, recreation areas, libraries, dayrooms, visiting rooms, control booths and related areas on A, C, D and E units. During the course of his visit, he conducted interviews with 20 prisoners, some of whom he had identified from their charts as receiving psychotropic medicines, others who were pointed out to him by other inmates as having mental health problems and a few chosen at random. He conducted these interviews in a lawyer's interview room; they lasted between 45 minutes and an hour and 15 minutes. Sometime after his visit, he conducted a telephone interview with a twenty-first inmate, who had been transferred from Supermax to the Wisconsin Resource Center.

Kupers met with Dr. Apple, a clinical psychologist at Supermax. He was unable to talk to the on-call psychiatrist, although he asked for the opportunity to do so. He returned to the institution at 10 p.m. one evening and visited a cell on Alpha Unit to gain a sense of the nighttime illumination in the cells. He reviewed clinical, classification, social service, medical and legal charts for the inmates he interviewed, plus several others. He reviewed the Legislative Fiscal Bureau, Prison Staffing, Supermax, Paper # 332; Rules of Department of Corrections; Wisconsin Legislative Audit Bureau Audit Summary, Report 01–9, May 2001; Administrative Directive, AD–39–1, Mental Health Screening of Inmate Candidates for Supermax; and Mental Illness Screening Tool for SMCI (DOC–2056, 4/00).

Kupers has visited a number of supermax facilities, in California, Texas, Indiana and Pennsylvania. He has never seen an institution with more restrictive conditions than Supermax. In Kupers' opinion, the conditions at Supermax are so isolating that they are "toxic" for seriously mentally ill inmates. Kupers believes that no amount of staffing could compensate for the isolation that inmates on Alpha Unit experience.

According to Kupers, isolated confinement intensifies symptoms for those prone to mental illness. The almost total isolation and inactivity deprives seriously mentally ill inmates of reality checks; they receive no feedback to keep their psychosis in check. Seriously mentally ill inmates in isolated conditions lose total control of their lives. They feel incapable of being an active agent in their lives; this feeling exacerbates depressive tendencies. Without interaction and without diurnal rhythms provided by light, seriously mentally ill inmates lose their sense of time and of the future, leading to great despair and hopelessness. This sense of doom is compounded when seriously mentally ill inmates are not capable of following the rules necessary to earn their way out of the most restrictive status.

Vincent Nathan has been a special monitor in a number of prison cases. He has been a consultant to the United States Department of Justice in developing jail and detention facility standards for the United States Marshals Service and the Immigration and Naturalization Service. He toured Supermax in July 2001 with Dr. Kupers and counsel. He considers the conditions at the institution as among the most restrictive he has ever seen. In his view, they "border on barbarism." To Nathan, it seems as though the Department of Corrections has taken steps to make life as miserable as possible for inmates at Supermax. He found no legitimate penological reason for restricting inmates in Alpha Unit to three showers a week in the heat of the summer, when each inmate has a shower in his own cell and does not require transportation to a central shower area. Also, he found no legitimate peno-

logical reason for requiring inmates using the "legal starter kit" library to wear handcuffs attached to belly chains at all times when they are alone in the library. Nathan observed that the door to the library includes a trap that could be used for uncuffing an inmate after he enters the library and recuffing him before he leaves it. Nathan noted that inmates are cuffed and shackled during video visits even though they do not leave the high security area in which they are housed.

Nathan was surprised to see the extent to which Supermax feeds Nutri-loaf to prisoners. (Nutri-loaf is ground food shaped into a loaf that can be eaten without utensils.) At Supermax, prisoners are fed Nutri-loaf for longer than seven days as punishment. Most institutions do not use Nutri-loaf at all and those that do, restrict its use to no more than seven days at a time, use it only for inmates who have food-related conduct reports, never use it as punishment and stop imposing it as soon as the offending conduct stops.

At Supermax, inmates must stand in the middle of their cells with the lights on and their trousers on in order to receive food or medication. If they do not comply, they are deemed to have refused the food or medication. In Nathan's opinion, the requirements for standing in the middle of the cell, etc., are legitimate but it is not reasonable for the institution to consider a failure to comply as a refusal of what is offered. This is especially true in the case of seriously mentally ill inmates who may not have the wherewithal to comply with the rules. For these inmates, this procedure only exacerbates a sense of hopelessness.

In Nathan's opinion, it is not appropriate to house inmates with serious mental illnesses at Supermax. The severe restrictions and isolation are counterproductive for this population, both for the inmates and for the prison staff; the isolating conditions increase dangerous behavior and management problems, such as feces smearing.

Defendants' expert, John Stoner, is Mental Health Coordinator at the Colorado State Penitentiary. He is a licensed psychologist who has taught at The College of Idaho, practiced privately as a psychologist and served as Mental Health Coordinator at the Colorado Womens Correctional Facility. He toured Supermax on February 12, 2001, with Assistant Attorney General Charles Hoornstra. The tour lasted over eight hours and included inspection of all parts of the physical plant, interviews with mental health staff, interviews with prison administrative staff and informal discussions with some of the inmates. He has reviewed documentation of the clinical and administrative histories of over 100 inmates at Supermax and has reviewed Dr. Kupers's declaration.

Stoner did not testify at the hearing but submitted an affidavit in which he took issue with many of Kupers's observations. Stoner does not agree that social isolation is as detrimental to mental health as others have found it to be. He notes that many non-prisoners are socially isolated by age, illness, incapacity, hearing loss, blindness or physical geography. In his opinion, Supermax inmates communicate with one another quite well, yelling down the range to each other or talking through the heating ducts of their cells. He did not comment on the institution rule prohibiting yelling and loud noises.

Stoner believes that the use of sliding boxcar doors is necessary for the protection of staff and other inmates from the dangerous and disruptive inmates housed at Supermax. He finds the expectations at Supermax straightforward and clear and takes issue with Kupers's conclusion that the inmates Kupers interviewed did not know why they were at Supermax or what

they had to do to advance to another level. He does not address Kupers's testimony that seriously mentally ill inmates may understand the written rules but may not know how to make (or are incapable of making) their behavior comply with those rules. He does not find the cell lights objectionable or any impediment to sleeping when turned to the low intensity. He disagrees with Kupers's impression that inmates have trouble gauging whether it is night or day in their cells.

In Stoner's opinion, the inmates presently housed at Supermax whom Kupers has identified as seriously mentally ill are either not as sick as Kupers makes them out to be, are malingering or are being dealt with appropriately by Supermax staff.

## IV. SCREENING AND MONITORING OF SUPERMAX INMATES

### A. *Initial Screening*

Before being transferred to Supermax, inmates are evaluated by a psychologist or psychiatrist at the sending institution. This initial screening is intended to review and detail the inmate's mental health history. If the mental health professional conducting this initial screening concludes that the transfer to Supermax would be detrimental to the inmate's mental health, the inmate will not be transferred. Many inmates have been rejected for transfer because of this initial screening. No inmate has ever been transferred to Supermax after having been deemed inappropriate for placement there. In practice, this initial screening is imperfect. Of the 20 prisoner files Dr. Kupers reviewed in detail, two were missing Mental Illness Screening Tools, one had a Screening Tool that had been completed one year after his transfer to Supermax and one had a Screening Tool that had been filled out incorrectly, stating that the inmate had no previous hospitalizations despite a clinical file indicating that he had been hospital-ized on several occasions, some before his incarceration and some after.

After the initial screening is complete, the form is forwarded to the Department of Corrections' director of psychiatric services. The director reviews the initial screening and either affirms the decision, reverses the decision or contacts the person who conducted the initial screening for clarification or additional information. As a result of this second screening, the director has reversed several approved transfers. On other occasions, the director has withheld his approval until getting clarification or additional information from the sending institution. If the inmate is approved for transfer to Supermax by the sending institution and the director of psychiatric services, he will be transferred to Supermax.

After arrival at Supermax, inmates undergo an additional screening conducted by one of Supermax's three Ph.D. level psychologists. This screening consists of a review of the previous screening form, a lengthy interview with the inmate, observation of the inmate and a thorough review of the inmate's clinical file. If following this screening evaluation or upon observation of the inmate's behavior upon arrival at Supermax the psychologist does not believe the inmate is appropriate for placement at Supermax, he or she has the authority to recommend the inmate for transfer to another institution or a mental health treatment facility. This step has been taken by psychologists at Supermax and no such recommendation has ever been denied.

Despite the screening mechanisms in place to screen inmates for mental illnesses before transfer to Supermax, Dr. Kupers has determined that many of the prisoners confined at Supermax do in fact suffer from serious mental illnesses. Having observed a high degree of psychopa-

thology in the twenty prisoners he interviewed, Kupers is of the opinion that many more prisoners at Supermax suffer from serious mental illnesses.

### B. *Monitoring at Supermax*

Whether or not diagnosed as mentally ill, each inmate at Supermax is seen on rounds at the door of his cell for the purpose of evaluating mental health at least once a month. These rounds are conducted by either a trained crisis intervention worker or a psychologist. In Alpha Unit (Level One), inmates are seen once a week. Should the crisis intervention worker observe symptoms of mental illness, changes in behavior or other troubling circumstances, he or she refers the inmate to a psychologist or psychiatrist for further evaluation and treatment. "Cell front" interviews conducted on rounds provide little privacy to inmates. Given this lack of privacy, it is difficult for mental health staff to develop a relationship of trust with inmates and to gain full insight into the inmate's mental condition.

In addition to cell front evaluations, unit staff and members of the mental health staff discuss each inmate on a weekly basis at unit meetings. These meetings provide the mental health staff with a formal opportunity to discuss the condition of the inmates with the unit staff who see the inmates on a daily basis and often recognize subtle changes in mood or behavior.

Supermax staff also hold weekly "special needs inmate" meetings at which they discuss inmates who have been previously identified as having a need or condition that requires special or additional monitoring. This meeting includes mental health, unit, administration and educational staff. In addition, each inmate at Supermax receives a general wellness screening from a member of the Health Services Unit staff on a regular basis.

Inmates who have been diagnosed as mentally ill and are on clinical monitoring have a psychologist assigned to them. That psychologist sees these inmates as often as is deemed necessary in the professional judgment of the assigned psychologist and psychiatrist. Inmates who have been prescribed medications to treat their mental illness are seen by the psychiatrist as often as is necessary for the psychiatrist to review the appropriateness of the prescription and dosage of the medication. The psychiatrist also provides counseling to inmates. These inmates are also seen and observed by a nurse each time that their medication is delivered to them in their cell.

The crisis intervention workers at Supermax are trained professionals who are able to evaluate and recognize signs of mental illness and distress. When such symptoms are identified, the crisis intervention worker will refer the inmate to a psychologist for additional evaluation. With a population of 350 inmates, the ratio of inmates to mental health staff is approximately 70 to one.

The Department of Corrections has procedures in place to medicate inmates involuntarily on an emergency basis and to transfer them to a treatment facility as soon as possible. "In an emergency ... the attending clinical psychologist, clinical social worker, or physician shall determine whether an emergency transfer to a state treatment facility ... is appropriate. Pending that determination, the attending physician may order involuntary treatment with psychotropic medication ... for as long as it takes to determine whether to initiate emergency transfer proceedings or for 72 hours, whichever is shorter." Wis. Admin. Code § DOC 314.08(1).

At Supermax, suicide watch records are kept in the inmate's clinical file with the rest of his psychiatric history and records. In addition, mental health staff has access to all of the inmate's various files to provide a complete view of a particular in-

mate's background and history. The mental health staff at Supermax provides treatment when an inmate's condition can be adequately treated on site. When a determination is made that an inmate should be transferred to an off-site facility, the transfer is usually made the same day.

At Supermax, the mental health staff is consulted and allowed to participate in cell placement and transfer decisions. This is especially true in cases where an inmate is suffering acute symptoms and the mental health staff is of the opinion that the inmate should be transferred to another facility.

### C. *Treatment of Suicidal Inmates*

When a Supermax inmate indicates that he is suicidal or engages in behavior that leads any prison official to believe that he is suicidal, the mental health staff is consulted immediately. The inmate is seen by a member of the mental health staff as soon as possible. The inmate is transferred to an observation cell that contains large windows and a camera to permit close monitoring of the inmate to prevent him from harming himself. In extreme cases, an inmate may be placed in restraints for brief periods of time for his own protection. In addition to this monitoring, the inmate is visited by a member of the staff every 15 minutes to verify his condition. Inmates in this status are reviewed at least every 12 hours by a member of the mental health staff to determine whether they are ready for release from observation. Once a mental health professional is satisfied that the inmate is no longer a threat to his own safety, the mental health professional will order the inmate released from observation status.

## V. INMATES WHO PLAINTIFFS ASSERT SHOULD NOT BE CONFINED AT SUPERMAX

During his tour of Supermax, plaintiffs' expert witness, psychiatrist Dr. Kupers, reviewed the files of many inmates. In the mental health charts, he noted frequent reference to "manipulation" and "malingering." These terms indicate that the mental health staff believes that the inmate is manipulating staff for his own benefit rather than exhibiting symptoms of mental illness. Although Kupers acknowledges that manipulation and malingering can be problems in any mental health setting, he finds that when staff are too wary of malingering, they overlook those who are in serious need of psychiatric help. For example, Kupers reviewed the files of inmates who have been admitted repeatedly to psychiatric hospitals, prescribed strong antipsychotic and mood-regulating medications and have been treated for serious mental illnesses for years. Nonetheless, the charts contain regular references to an inmate's "merely manipulating." However, an inmate can malinger and have a serious mental illness at the same time. In settings with insufficient staff, prisoners may discover that they have to manipulate to a certain extent in order to get the attention they need. Kupers is aware of many situations at other institutions in which a staff member dismissed a cry for help as manipulation, only to find that the prisoner committed suicide in the meantime. There have been many attempted suicides and instances of self-harm at Supermax but no successful suicides.

Because chart entries noting "malingering" do not indicate the absence of mental illness, Dr. Kupers uses as a guide an operational definition of a prisoner with a serious mental illness in a supermaximum prison, as proposed in "Who Lives in Super–Maximum Custody? A Washington State Study," *Federal Probation,* 64–2, December 2000, p. 33. This definition consists of five indicators, any one of which provides reasonably strong evidence of a serious mental disorder: confirmed serious

mental illness by evaluation of a mental health professional with the assessment recorded electronically; multiple acute care admissions (at least three) to an acute care facility at the state penitentiary; case management notes with mention of hallucinations, delusions and psychotropic medications in the chart; mental health residency of 30 or more days in one of the department's residential mental health units; or an electronically recorded diagnosis of a psychotic disorder, bipolar disorder, major depression, dementia or borderline personality. Dr. Kupers also notes that in general, the symptoms of a mental illnesses are always present in mentally ill persons but that breakdowns themselves are only periodic. It not unusual for an inmate with a serious mental illness to report that he is feeling better and to suffer a breakdown a few days later.

Dr. Kupers interviewed twenty inmates at length. Almost all of the inmates exhibited signs of severe stress and emotional disturbances. Of the inmates he interviewed, Kupers determined that seven suffer from serious and long-term mental illnesses, including psychotic disorders and severe affective disorders. Many of these inmates reported that they did not know why they were at Supermax or what they had to do to advance to a higher level. In addition, Kupers interviewed by telephone a twenty-first prisoner who suffers from serious mental illness. In Kupers's professional opinion, these eight prisoners are suffering psychiatric reactions to the conditions of confinement in Supermax.

A. *Prisoner 1*

Prisoner 1 is a 25–year–old who was transferred to Supermax in February 2001. He has a history of serious mental illness beginning at age 11. According to an entry in his clinical file dated December 14, 1995, he was diagnosed with Paranoid Schizophrenia. Prisoner 1 experiences command hallucinations, which are voices that tell him to do bad things. Prisoner 1's charts list medication orders dating back to 1995 that include the antipsychotic medications Thorazine, Haldol, Quetiapine, Seroquel, Loxitane, Risperdal and Olanzapoine. On the Mental Illness Screening Tool in his file, Prisoner 1 was assigned a diagnosis of "Chronic Paranoid Schizophrenia v. Major Depression with Psychotic Features."

Prisoner 1 has spent almost all his time at Supermax on Level One. He was moved to Level Two in mid-June 2001. Since his arrival at Supermax, he has been seen eight times by clinical staff and has had regular contact with the psychiatrist. Supermax psychiatrist Dr. Gary Maier has had discussions with Prisoner 1 about the voices Prisoner 1 hears, his medication and coping strategies. On April 3, 2001, Dr. Maier made note of Prisoner 1's eye contact and "clear and crisp" thinking during the interview, as well as the fact that Prisoner 1 "appeared to coping quite well." Since April 24, 2000, Dr. Maier has been prescribing increasing doses of Thorazine. On June 16 and July 10, 2001, Dr. Maier saw Prisoner 1, who reported that "the Thorazine was helping the voices" and he was "sleeping relatively well at night."

After Prisoner 1 indicated that he had received a program at another prison to help him deal with "controlling voices," Supermax psychologist Colette Cullen researched the program and determined that it was not "specifically about controlling voices." She also noted that the doctor at the other institution remembered Prisoner 1 and agreed with Cullen's assessment that the voices being heard by Prisoner 1 were a "grief reaction rather than a psychotic symptom." Cullen then offered to "discuss the grief process in further detail" with Prisoner 1.

On August 2, 2001, Cullen met with Prisoner 1 in an interview room. She

noted that Prisoner 1 "presented with appropriate affect, good eye contact, and goal-directed thought content." Prisoner 1 noted that his medication was helping him sleep. Cullen and Prisoner 1 discussed the voices reported by Prisoner 1; Cullen offered to begin grief therapy with Prisoner 1, who agreed to consider it.

On July 27 or 28, 2001, Prisoner 1 told Dr. Kupers that he hears voices constantly that command him to kill himself or hurt others. This surprised Kupers because Prisoner 1 is currently taking a relatively high dose of his prescribed medication: 300 mg. of Thorazine twice daily. Prisoner 1 told Kupers that he cannot sleep because he "sees things," including "demons moving around on the floor and climbing up my bed" all night. Prisoner 1 told Kupers that he has paranoid thoughts that the guards are out to get him. He paces in his cell. Prisoner 1 continues to experiences auditory hallucinations and massive anxiety despite his strong psychotropic medication; Kupers is of the opinion that this is a result of the continuing stress of confinement at Supermax and the lack of an adequate mental health treatment program.

### B. *Prisoner 2*

Prisoner 2 is a 23–year–old male who has been admitted to Supermax twice, in February 2000 and again in February 2001, with an intervening stay at Mendota Mental Health Institute. By his own report, he has been diagnosed at various times as schizoaffective, bipolar, obsessive-compulsive disorder, borderline character disorder, antisocial personality disorder and histrionic personality disorder. He is currently prescribed Librium (a tranquilizer), Paxil (an antidepressant) and Depacote (a mood regulating medication). A February 5, 1998 psychiatric examination indicates that Prisoner 2 was diagnosed with schizophrenia and that the antipsychotic medication Haldol and the mood regulator Valproic Acid were prescribed for him. Prisoner 2 has attempted suicide two times since February 2000. Although Prisoner 2 reached Level Three in spring 2000, he is often returned to Level One for minor infractions or for attempts on his own life.

Between February 22, 2000, and August 15, 2001, Prisoner 2 was seen by a psychologist or crisis intervention worker at Supermax on at least 46 occasions. On June 2, 2000, crisis intervention worker Kool noted that Prisoner 2 was making "self-harm" gestures. Kool viewed the behavior as attention-seeking rather than as true self-harm but noted that measures should be taken to insure he did not truly harm himself with a reckless gesture. On that same day, Prisoner 2 admitted that his behavior was attention-seeking and impulsive. On June 8, 2000, Prisoner 2 admitted to Kool that "he does not and never did feel suicidal. Was a means to gain attention." On June 16, 2000, Prisoner 2 told a crisis intervention worker that he was not suicidal.

On July 11 and July 24, 2000, Prisoner 2 reported that he was feeling very anxious about his upcoming court appearances but that he was not suicidal. During the visit, Prisoner 2 and Dr. Apple (a psychologist) discussed anxiety reduction techniques.

Prisoner 2 started seeing Dr. Maier on July 29, 2000, when Dr. Maier reviewed Prisoner 2's medications with him. On August 5, 2000, Dr. Maier noted that Prisoner 2 reported that "things have gone quite well for him." Dr. Maier talked to Prisoner 2 about stopping Clonidine since Prisoner 2 did not know why he was taking it. In addition to medication management, Dr. Maier counseled Prisoner 2 about his interpersonal problems.

On January 2, 2001, Dr. Maier and Prisoner 2 discussed more of Prisoner 2's history and the problems that he was having

as a result of an additional six year sentence. The following month, just before Prisoner 2 was to go to trial for additional charges, Dr. Maier met with him and noted that "There is no reason to change the medication at the present time."

On approximately June 25, 2001, Prisoner 2 returned to Supermax after spending time at Mendota Mental Health Institute. After Prisoner 2 expressed confusion about his return to Supermax, Dr. Apple took steps to confirm that Prisoner 2 was legally placed at Supermax. Dr. Apple also noted that Prisoner 2 "will be visited by an independent (non-Supermax, non MMHI) evaluation for clinical appropriateness to be at SMCI." Prisoner 2 was evaluated by a doctor from the Wisconsin Resource Center on July 31, 2001, who determined that his placement at Supermax was appropriate.

When Dr. Kupers reviewed Prisoner 2's files, he noted that although Prisoner 2 is described as manipulative, other entries indicate that he suffers from borderline personality disorder and that he has been prescribed a range of antipsychotic and antidepressant medications. Kupers is of the opinion that Prisoner 2 has severe depression and psychosis. On July 27 or 28, 2001, Kupers interviewed Prisoner 2, who told Kupers that he was unable to sleep because of the constant illumination. He described constant paranoid ideas, worsened by lack of sleep. He reported that he is always terrified that the doors will open and he will be attacked by officers. He appeared agitated. He said he experienced mood swings and was afraid that he would never be able to work his way out of Supermax because of his psychiatric disability. He told Kupers that he thinks often about ending his life. Prisoner 2 reported that his symptoms improved at Mendota Mental Health Institute because he was permitted out of his cell; his condition has deteriorated since he has been at Supermax.

### C. *Prisoner 3*

Prisoner 3 is a 17–year–old who entered Supermax on April 9, 2001, allegedly for biting an officer during a cell extraction. Prisoner 3's clinical chart documents chronic, severe mental illness, starting as early as nine years of age. Prisoner 3 has been diagnosed with bipolar disorder, multiple personality, depression and schizophrenia and has been prescribed antidepressants and antipsychotic agents. In his clinical charts, Prisoner 3 is described as manipulative. Two or three years before his transfer to Supermax, he reported hearing voices but the chart does not show any follow-up to this report. Prisoner 3 had a serious suicide attempt by hanging in September 2000. He committed very few infractions at his previous placement at Prairie du Chien before setting his cell on fire but has received 15 conduct reports in the short time he has been housed in the Alpha Unit at Supermax.

Clinical staff at Supermax have seen Prisoner 3 at least 12 times since his transfer there in April 2001. On April 17, 2001, Dr. Maier noted that Prisoner 3 "seems to be managing well ... said that he was coping" and "has no thoughts of harming himself." When Prisoner 3 asked for medication to aid him in sleeping, Dr. Maier indicated that he would need parental approval because Prisoner 3 was a minor. The same day, Dr. Maier called Prisoner 3's mother. In addition to obtaining consent to prescribe medication, Dr. Maier discussed Prisoner 3's medical and mental health history with his mother and told her that she could call him if she had any questions.

On May 22, 2001, Dr. Maier acknowledged that Prisoner 3 was having "real problems adjusting" at Supermax. However, he did not attribute these problems

to mental illness. Dr. Maier discussed with Prisoner 3 his "bad attitude" and the fact that he is "willfully disruptive." In the same discussion, Prisoner 3 complained of side effects; Dr. Maier discontinued Trazodone and started Prisoner 3 on Amitriptyline. Dr. Maier saw Prisoner 3 again on June 19, 2001, and discussed Prisoner 3's conduct, medical history and medication regime. On July 31, 2001, Prisoner 3 stated his desire to maintain the present medication and Maier agreed.

On July 27 or 28, 2001, Dr. Kupers interviewed Prisoner 3 and determined that he exhibited the most severe depression that he has seen in years. Prisoner 3 told Kupers that he has attempted to hang himself with serious suicidal intention on three occasions; he was clad in a protective vest at the interview. Prisoner 3 reported that he refuses to tell staff how suicidal he feels because he is convinced that they will not spend time talking with him but will place him in a strip cell. On a mental status examination, Kupers discovered very flat affect, psychomotor retardation, hopelessness, anhedonia, worthlessness and other signs and symptoms of serious affective disorder. Kupers believes that the risk of suicide for Prisoner 3 is especially acute because of his young age. In Kupers's experience, the all-or-nothing attitude of adolescence lends itself to suicide. The harsh conditions at Supermax and the lack of meaningful activities are greatly exacerbating this inmate's chronic and serious mental illness, making his prognosis very grave.

### D. *Prisoner 4*

Prisoner 4 is a 22–year–old who entered Supermax in November 1999. Prisoner 4 has been prescribed Imipramine (an antidepressant), Lithium (a mood regulator), Risperdal (a powerful antipsychotic) and Valium (a minor tranquilizer). Currently Prisoner 4 is not taking any psychiatric medications. In Prisoner 4's clinical chart,

there is some disagreement among clinicians about his diagnosis. He is described as impulsive, assaultive and out of control. At the same time, he is described as having racing thoughts and being hyperactive, which Dr. Kupers believes are signs of bipolar disorder. The Mental Illness Screening Tool was not completed for Prisoner 4 until he had been at Supermax for one year. Prisoner 4 has been confined in the Alpha Unit, Level One, for the great majority of this time. He was in Level Two for 13 consecutive days in 1999 and again for 2 days in August 2001. He has accumulated many disciplinary infractions since his arrival at Supermax.

Between December 21, 1999 and July 6, 2001, Prisoner 4 was seen by Supermax mental health staff at least 29 times. According to many different staff members, Prisoner 4 states frequently that he intends to harm himself but withdraws the statements quickly once he is visited by an officer to whom he can complain. He has told several staff members that he will "say what he would have to say to get a white shirt to his cell door." On June 27, 2001, Prisoner 4 stated that he would harm himself. When a crisis intervention worker arrived to evaluate and assess him, he told her, "I want a white shirt, not you."

On July 27 or 28, 2001, Dr. Kupers interviewed Prisoner 4. Prisoner 4 told Kupers that he experiences auditory hallucinations from time to time. He feels entirely incapable of controlling his anger; he complained that he is always anxious and pacing. Prisoner 4 reported that he has tried to harm himself many times. He has undergone a large number of cell extractions and been restrained or kept in observation many times. He told Kupers that he was less anxious when he was incarcerated at Mendota Mental Health Institute. Prisoner 4's clinical records indicate that Prisoner 4 improves with men-

tal health treatment and psychotropic medications and that his mental condition deteriorates when confined at Supermax. Prisoner 4 reported that he feels he is caught in a never-ending cycle of "no-wins" in which his anxiety and lack of control cause him to misbehave, he suffers cell extractions and becomes even angrier and he is never released from the unbearable situation that causes him to misbehave. Prisoner 4 suffers from a serious mental illness and his mental condition is deteriorating at Supermax.

### E. *Prisoner 5*

Prisoner 5 is a 42–year–old who was transferred to Supermax in November 1999, when the facility opened. He had no history of psychiatric illness or mental health treatment before entering Supermax. In Prisoner 5's clinical chart, there are many notes about his smearing feces, being a danger to himself, yelling and refusing to eat. Prisoner 5 spent at least 15 months on Level One.

When Dr. Maier began working with Prisoner 5, Prisoner 5 had been smearing feces and destroying property. Dr. Maier reduced Prisoner 5's prescription of Diazepam because it was potentially addicting and conducted further visits to check on Prisoner 5's condition and medication. On January 10, 2000, crisis intervention worker Brian Kool spoke with Prisoner 5 after Prisoner 5 had been smearing feces. In his discussion with Kool, Prisoner 5 indicated that his smearing was in response to the fact that he "wasn't getting his appropriate writing property."

On April 11, 2000, Prisoner 5 "smeared feces 1 hour after release from observation." When he spoke with psychologist Dr. Twila Hagan regarding this incident, Prisoner 5 did not suggest that the smearing was anything other than "a message that he cannot be threatened" and that he "refused to remove the feces from the windows because then it will have been done for nothing." On June 22, 2000, crisis intervention worker Linsheid saw Prisoner 5 at the request of Supermax's security director. This request was prompted by Prisoner 5's telling "property to send all his stuff out—that's a red flag."

Dr. Maier saw Prisoner 5 on August 7, 2001, because of his "hunger strike." Dr. Maier recommended that Prisoner 5 be "clinically and medically monitored to insure adequate hydration and nutrition and indicated that he would see him next week."

On July 27 or 28, 2001, Dr. Kupers interviewed Prisoner 5. He complained of severe depression, acute suicidality and generalized anxiety with episodes of severe panic. When asked whether he is suicidal, his eyes displayed tears and sadness. He stated that he has been contemplating suicide for some time and was currently intent on ending his life. He has had many disciplinary tickets; Dr. Kupers links some of the infractions to his psychiatric condition. For example, he experiences the walls closing in on him, severe anxiety, panic, palpitations and trouble breathing. Moreover, he reports great difficulty breathing at times in the hot, humid cell. During those times, he decides to get out of his cell without regard for the consequences and he covers his window with something, knowing the officers will come and perform a cell extraction. Prisoner 5 reported that he spent a period of time in April 2000 either frequently or continuously confined in an observation room or in restraints. He alleged that he was naked much of that time. He reported that he did not want to repeat that traumatic event, so he does not seek mental health treatment despite feeling suicidal.

On a mental examination status, Prisoner 5 was very sad, exhibited psychomotor retardation typical of severe depression, earnestly expressed a wish to die and ex-

hibited hopelessness, helplessness and powerlessness. Kupers is of the opinion that extreme, bizarre acts such as smearing feces and hunger strikes are indications that the individual has severe mental illness; the acts should be treated as serious cries for help. He believes Prisoner 5 is at serious risk of suicide because he is extremely depressed and experiences panic attacks. It is quite likely that the stressful conditions at Supermax are keeping Prisoner 5 in a perpetual state of panic, agitation and suicidality.

### F. *Prisoner 6*

Prisoner 6, a 32–year–old, has been incarcerated at Supermax since April 2000. Prisoner 6 has had difficulties in institutions before his transfer to Supermax. Prisoner 6 has a long history of serious mental illness, beginning in 1991, when he was given a diagnosis of depression with psychotic features and prescribed the antipsychotic medication Haldol along with the antidepressant medication Elavil. On a November 2, 2000 admission mental health questionnaire at Supermax, he reported feeling confused and paranoid and suffering from hallucinations. There is no Mental Health Screening Tool in his clinical file. Although Prisoner 6 was in Level Three in December 2000, while there he broke a television, used the glass to cut himself and has not reached Level Three since that time.

Between September 30, 2000, and July 24, 2001, Dr. Maier saw Prisoner 6 thirteen times. Between April 1, 2000, and June 2, 2001, Prisoner 6 was also seen by a psychologist or crisis intervention worker 20 times. In his notes, on more than one occasion, Maier suggests that "the description that [Prisoner 6] gave about his hallucinations does not fit any typical pattern of auditory hallucinations reported by people that suffer from true medical disorders." Despite his suspicions, Dr. Maier prescribed Haldol to a persistent Prisoner 6

because he was "banging his head" to get it. Dr. Maier's notes indicate that this prescription was closer to a "placebo plan" than anything else.

During 2001, Dr. Maier noted improvements in Prisoner 6's presentation during their meetings. On April 17, 2001, he noted "the best and most sensible discussion that I have had with [Prisoner 6] since I began seeing him last fall." On May 1, 2001, Dr. Maier saw Prisoner 6 at his cell, noticed Prisoner 6 "was not wearing his earplugs" and noted that it was "one of the first times that I have seen him where he is not wearing his earplugs." When Dr. Maier asked Prisoner 6 how he was doing, he reported that he was "fine" and that "he thought the medication was helping." Dr. Maier noted that the earplugs were also absent during sessions with Prisoner 6 on June 12, 2001, and July 24, 2001.

On July 27 or 28, 2001, Dr. Kupers interviewed Prisoner 6. Prisoner 6 reported that he sees dead people lying on the floor. Before his transfer to Supermax and for all the time he has been in Supermax, whenever he is confined to his cell the voices he hears become more intense and he experiences severe anxiety and paranoia. Prisoner 6 states that the voices he hears have become stronger since his arrival at Supermax. He explained that he does not participate in visits with his family via video monitors because "they could be faking the images." Prisoner 6 has a history of multiple suicide attempts, including cutting all over his body. Prisoner 6 reported an earnest suicide attempt in December 2000 when he cut his head with a piece of broken glass "because [he] wanted to see what was inside [his] head." In Kupers's professional opinion, this kind of bizarre and extreme suicidal act is usually a sign of schizophrenia. Prisoner 6 told Kupers that he had overdosed with pills and that he had tried to commit sui-

cide to get the voices to stop. Prisoner 6 suffers from a serious mental illness and is suffering as a result of the restrictive conditions at Supermax.

## G. *Prisoner 7*

Prisoner 7 is a 29–year–old who has been incarcerated at Supermax since March 2001. Prisoner 7 had no psychiatric history and never took psychiatric medication before entering prison but was diagnosed and treated for mental illness before his transfer to Supermax. Currently, he suffers from a severe, chronic depression with imminent suicide potential and possible psychotic features and borderline character disorder. He is prescribed Remeron, an antidepressant medication. Prisoner 7 is H.I.V. positive and quite depressed about his medical condition. Prisoner 7 is actively hallucinating: he sees dead people walking around and hears someone (a voice others do not hear) talking to him.

Prisoner 7 has been treated by Dr. Maier on five occasions since his transfer to Supermax in March 2001. He has also been seen by Supermax psychologist Colette Cullen 11 times. In addition to Drs. Maier and Cullen, Prisoner 7 has also been seen by crisis intervention workers Wilmot or Bindl on twelve occasions.

Prisoner 7 tied a sheet around his neck in an effort to kill himself early in his stay at Supermax, but his condition seemed to improve somewhat when he was prescribed anti-anxiety medication. Dr. Cullen noted that although Prisoner 7 stated that he would not harm himself, he was experiencing several stressors and she would raise his case at the regular meetings. At that time, Cullen noted that Prisoner 7 "seems to have passed a hurdle in adjusting to his environment."

On July 17, 2001, Prisoner 7 banged his head against the door, causing a gash on his forehead that needed stitches. He reported to crisis intervention worker Wilmot that he "wanted to die." Because of the risk of self-harm, Prisoner 7 was placed in restraints. After several hours and two visits by Cullen, Prisoner 7 had calmed down somewhat and was eventually released from restraints. At a July 20, 2001 staff meeting, it was decided that Prisoner·7 would "be monitored and assessed closely until his upcoming scheduled [program review committee]. At which time he will be re-evaluated for his appropriateness at SMCI."

On July 22, 2001, Prisoner 7 was unhappy with the fact that he was allowed only a thin segregation mattress after having destroyed his regular mattress. He told Cullen that he intended to get himself "strapped down" so that he could lie on a "regular mattress." As promised, Prisoner 7 banged his head against his cell door. Cullen reported that Prisoner 7 "seemed satisfied that he received what he wanted." During their discussion, Prisoner 7 denied suicidal ideation, stating that he banged his head to get on the regular mattress. On August 6, 2001, Cullen spoke with Deputy Warden Huibregtse about the appropriateness of Prisoner 7's placement at Supermax. They decided to enlist Dr. Hagan, Supermax's part-time licensed psychologist, to complete an evaluation of Prisoner 7.

On July 27 or 28, 2001, when Dr. Kupers saw Prisoner 7, he was in the observation unit of the Alpha Unit, with a deep gash in the middle of his forehead where he had been banging his head against a metal door a few days earlier. Prisoner 7 complained of severe depression because of his H.I.V. positive status and because his family had cut him off. Prisoner 7 is chronically suicidal. Dr. Kupers believes that confinement at Supermax has greatly exacerbated his mental illness and made his long-term prognosis more grave. He is at serious risk of suicide.

On September 11, 2001, following discussions of their differing diagnoses of Prisoner 7, Hagan and Cullen decided that temporary transfer to the Wisconsin Resource Center would be appropriate in order to have him diagnostically evaluated. On September 13, 2001, Prisoner 7 was transferred to the Wisconsin Resource Center.

### H. *Prisoner 21*

Prisoner 21, a 23–year–old, was transferred to Supermax in January 2000. As early as age 12, Prisoner 21 was diagnosed with serious mental illnesses. He was hospitalized six times before his first incarceration. He has been diagnosed with adjustment disorder with disturbance of mood, psychosis, personality disorder, depressive disorder and attention deficit disorder. He has had several self-harming episodes in the past, such as by hanging and cutting his neck and wrists. On August 28, 2001, Prisoner 21 was transferred to the Wisconsin Resource Center after his most recent suicide attempt.

Dr. Kupers interviewed Prisoner 21 on the telephone rather than in person. Dr. Kupers found him to be depressed and psychotic. He believes that incarceration at Supermax is harmful to Prisoner 21 and that he should not be returned there.

### VI. DEFENDANTS' KNOWLEDGE OF CONDITIONS AT SUPERMAX

In a May 2001 report, the Wisconsin Legislative Audit Bureau found that more than 15% of the prisoners at Supermax are suffering from mental illness. For the purpose of the report, "mental illness" was defined as inmates who are prescribed psychotropic medication. Approximately 70% of those Supermax inmates being prescribed psychotropic medications are receiving Benadryl, an antihistamine commonly used by many who are not mentally ill, or other medications technically considered psychotropic in nature but not pre-

scribed for the treatment of serious mental illness. The May 2001 Legislative Audit noted that "concerns have ... been raised about the transfer of mentally ill inmates to the Supermax Correctional Institution."

Defendants initially had a policy that no mentally ill prisoners would be housed at Supermax but abandoned that policy in the year 2000.

Defendants have in their possession a copy of Dr. Stuart Grassian's pioneering article, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450 (1983). The article documents what Grassian found to be the devastating mental health effects of isolated confinement.

In a December 1, 2000 letter to Dr. Gary Maier, defendant Berge addressed the inadequacy of mental health services at Supermax. In the letter, he stated

I am concerned about available psychiatric hours here. When we designed the staffing of this facility, we clearly concluded that we needed a full-time equivalent psychiatric consultant as part of the medical contract. As you know we ended up with an 8 hour per week arrangement. This result was driven exclusively by budget factors.

Defendant Berge asked Dr. Maier to assess the number of psychiatric hours needed to treat the population.

In the past, defendants utilized a screening tool entitled Mental Illness Screening Tool for Supermax and dated April 2000. This form lists three categories: general clearance for SMCI; conditional transfer to SMCI; and restricted movement to SMCI. Under "restricted movement to SMCI," the following mental health conditions are listed: Major Depressive Disorders; Bipolar Disorder; Borderline Personality Disorders; Dissociative Disorders; Schizophrenic/Psychotic Disorders; Mental Disorders due to a medical condition;

and History of severe self-abusive behaviors. Prisoners with serious mental illnesses listed under "restricted movement" are in fact housed at Supermax. The April 2000 Mental Illness Screening Tool in no longer in use. Even when the April 2000 form was in use, the "restricted movement" conditions were not intended to exclude inmates from being transferred to Supermax. As is the case with the present form, each transfer to Supermax was considered on a case-by-case basis.

The filing of the amended complaint in this lawsuit on August 15, 2001, alleging that conditions at Supermax "cause serious and sometimes catastrophic deterioration" in the mental health of mentally ill prisoners, placed defendants on notice of these alleged conditions.

## OPINION

### A. *Standards for Preliminary Injunction*

■ A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant carries the burden of persuasion by a clear showing. *See Boucher v. School Bd. of Greenfield*, 134 F.3d 821 (7th Cir.1998). In order to succeed on a motion for a preliminary injunction, the moving party must show (1) more than a negligible chance of success on the merits and (2) no adequate legal remedy and irreparable harm if preliminary relief is denied. Once this is established, the district court must then consider (3) the balance of hardships between the plaintiffs and the defendants, adjusting the hardships for the probability of success on the merits and (4) the public interest. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992); *see also Planned Parenthood v. Doyle*, 162 F.3d 463, 473 (7th Cir.1998).

■ The Prison Litigation Reform Act limits the scope of preliminary injunctive relief available in challenges to prison conditions. The Act provides that

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. This court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief. . . .

18 U.S.C. § 3626(a)(2). This provision does not change the standard for determining whether to grant a preliminary injunction. *Smith v. Arkansas Dept. of Correction*, 103 F.3d 637, 647 (8th Cir.1996).

### B. *Likelihood of Success on the Merits*

Defendants have treated this aspect of the case as a challenge to the medical care that the seven seriously mentally ill inmates are receiving at Supermax. Defendants would have the court limit its review to whether defendants' "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Defendants' focus is too narrow. The case that plaintiffs have made is that the decision to place a seriously mentally ill inmate at Supermax is an Eighth Amendment violation in and of itself. The specific medical care that the inmate receives or fails to receive once there is not a part of the analysis. The conditions at Supermax are so severe and restrictive that they exacerbate the symptoms that mentally ill inmates exhibit. Rather than being supplied the programming, human contact and psychiatric support that seriously mentally ill inmates need to prevent their illnesses from escalating, inmates at Supermax are kept isolated from all other humans, whether guards, other inmates or family

members. They are given no programming unless they progress out of the lower levels of the incentive program and they receive limited psychiatric support. Many of the severe conditions serve no legitimate penological interest; they can only be considered punishment for punishment's sake.

Not surprisingly, the mentally ill inmates identified by plaintiffs rarely progress out of Level One of the incentive program or, if they do, their upward movement is only temporary. An exception is Prisoner 2, who bounces between Levels One and Two and has had a short stay on Level Three. These inmates are stuck in the lowest levels, a circumstance that by itself suggests the inappropriateness of subjecting such persons to an incentive program that is so all encompassing and harsh. As former Secretary Sullivan testified, the Wisconsin Resource Center was developed for the very purpose of helping inmates who got "stuck" in segregation.

█ Because I find that the conditions about which plaintiffs complain are particularly harsh with respect to seriously mentally ill inmates, I do not need to reach the question whether defendants failed to provide them adequate medical treatment. Instead, plaintiffs must demonstrate a "better than negligible chance of succeeding," *Boucher*, 134 F.3d at 824, in their claim that the conditions of confinement at Supermax constitute cruel and unusual punishment in violation of the Eighth Amendment with respect to seriously mentally ill inmates. A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that inmates face a substantial risk of substantial harm and disregards that risk by failing to take reasonable measures to reduce that harm. *Id.* at 834. Plaintiffs must show that the conditions to which they are subjected are "sufficiently serious" (objec-

tive component) and that defendants are deliberately indifferent to inmates' health or safety (subjective component). *Id.*

### 1. *Sufficiently serious conditions*

█ Conditions of confinement that deprive prisoners of the "minimal civilized measure of life's necessities" satisfy the objective component of the Eighth Amendment inquiry. *Id.* (citations omitted). The Eighth Amendment protects individuals against both harm that is occurring and against "conditions posing a substantial risk of serious harm" if allowed to continue. *Id.* at 828. There is no question that suicide is a serious harm. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir.1996). Similarly, it is well settled that the Eighth Amendment protects the mental health of prisoners no less than their physical health. *See, e.g., Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.1987); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983). "If the particular conditions of [confinement] being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture." *Madrid v. Gomez*, 889 F.Supp. 1146, 1264 (N.D.Cal.1995). "The same standards that protect against physical torture prohibit mental torture as well—including the mental torture of excessive deprivation." *Ruiz v. Johnson*, 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F.Supp.2d 975 (S.D.Tex.2001).

█ The almost complete isolation and sensory deprivation that constitute the conditions of confinement in Levels One and Two at Supermax are not in dispute. What is in dispute is the extent to which

these conditions constitute sufficiently serious conditions of confinement to implicate the protections of the Eighth Amendment for seriously mentally ill inmates confined there. Credible evidence indicates that Supermax is not appropriate for seriously mentally ill inmates because of the isolation resulting from the physical layout, the inadequate level of staffing and the customs and policies. Supermax was designed to house especially disruptive and recalcitrant prisoners but not mentally ill ones.

Several features of Supermax are particularly damaging to inmates with serious mental illnesses. The almost total sensory deprivation in Levels One and Two is relentless: inmates are kept confined alone in their cells for all but four hours a week. The exercise cell is devoid of equipment. The constant illumination is disorienting, as is the difficulty in knowing the time of day. The vestibule architecture and solid boxcar doors prevent any incidental interaction between inmates and guards. No programming is offered in Level One; the limited programming in Level Two takes place on a solitary basis at the door of each prisoner's cell rather than in a different setting or with other prisoners.

The staffing of inmates to mental health professionals at Supermax is approximately 70:1. The ratio of mentally ill inmates (defined as those prescribed psychotropic medications) to staff is approximately 10:1. In Sullivan's professional opinion, this level of staffing is insufficient to stabilize mentally ill inmates. For example, at the Wisconsin Resource Center the ratio of mental health staff to inmates is about 3 to 1. In Sullivan's opinion, segregation is counterproductive for seriously mentally ill inmates unless there is appropriate staffing to offset the isolating effect; the Wisconsin Resource Center is the only facility with adequate staffing. Kupers and Nathan are both of the opinion that no amount of staffing would counteract the isolating effect of the physical layout at Supermax.

The testimony and clinical records also document the extent to which the mental conditions of the identified inmates have deteriorated since their arrival at Supermax. Without exception, Prisoners 1 through 7 have suffered intensified symptoms, whether increased depression, severe hopelessness, attempts at suicide, command hallucinations or bizarre behavior. Although in most cases the prescribed medications have lessened these symptoms, plaintiffs point out that the severe conditions are likely to have triggered or exacerbated the symptoms in the first place. Moreover, it is not surprising that the medications reduce symptoms; this is what these medications are designed to do. What is surprising is that some inmates, such as Prisoners 1 and 2, are still experiencing symptoms despite the strong medications they are being prescribed.

Dr. Stoner asserts that these inmates are not as seriously ill as plaintiffs make them out to be. This argument is not persuasive: the inmate's clinical charts shows that each of them has been treated for various symptoms of mental illness, in most cases for years. (Prisoner 5 is the exception; he had never been diagnosed with a serious mental illness before his transfer to Supermax.) Dr. Stoner asserts that these inmates are "malingering" in order to manipulate staff to their benefit. Although these inmates may be manipulating staff, this does not mean that they are not also seriously mentally ill. After all, if these inmates were only malingering and not seriously mentally ill, there would be no reason for Supermax's psychiatric and psychological staff to prescribe them strong antipsychotic, antidepressant or mood-regulating medications.

Defendants rely on *Bono v. Saxbe*, 620 F.2d 609 (7th Cir.1980), for the proposition

that the mere placement of seriously mentally ill inmates in segregation status does not constitute cruel and unusual punishment. In *Bono*, the Court of Appeals for the Seventh Circuit reviewed an Eighth Amendment challenge to the conditions of confinement in the "Control Unit" at the federal prison in Marion, Illinois. Although the conditions at the Marion facility were severe, they were not nearly as isolating and restrictive as those at Supermax: only some inmates were held in closed front cells with boxcar doors; inmates left the cells for half an hour each day either to shower or to go to recreation; prison officials exercised "some discretion" over inmates' reading materials; and visits took place through plexiglass and over a telephone. *Id.* at 613. The plaintiffs in *Bono* did not allege that the cells were illuminated 24 hours a day, that the temperature fluctuated wildly, that the medical staffing was insufficient, that their cells were separated from the main hallway by vestibules, that they were not allowed to possess clocks or watches or that their visits took place through video monitoring. Moreover, the plaintiffs in *Bono* were challenging the conditions as to all inmates; the court did not focus on the conditions as they applied to seriously mentally ill inmates other than with this single phrase: "Prison officials, not doctors, decide whether to transfer a mentally ill prisoner out of the Control Unit." *Id.* Defendants place great reliance on the fact that in *Bono*, the court determined that having prison officials and not doctors determine whether to transfer mentally ill inmates did not constitute a violation of the Eighth Amendment. Defendants reason that because medical and not prison staff at Supermax decide whether to transfer mentally ill inmates, the conditions must not constitute cruel and unusual punishment. Defendants' logic is flawed. Defendants fail to take into account the fact that who determines whether to transfer

mentally ill inmates is only one condition among many. Taking the circumstances as a whole, I find that plaintiffs have demonstrated more than a negligible chance of establishing that the conditions at Supermax are more harsh toward seriously mentally ill inmates than those at issue in *Bono*.

Plaintiffs rely on *Madrid*, 889 F.Supp. 1146, and *Ruiz*, 37 F.Supp.2d 855, in which district courts held that the conditions in security housing units constituted cruel and unusual punishment with regard to seriously mentally ill inmates. Defendants contrast the facts of this case with those in *Madrid* in an attempt to distinguish the cases but I remain convinced that the conditions at Supermax more closely reflect those in *Madrid* and *Ruiz* than those in *Bono*. Although the level of mental health staffing at Supermax is much greater than in *Madrid*, no amount of staffing could compensate for the physical isolation that inmates encounter on Level One. The prison in *Madrid* was lacking some procedures that Supermax does have in place: a procedure for providing involuntary medication to inmates, a screening system, a monitoring system, clinical records (albeit not always complete), properly trained crisis intervention workers, suicide notes kept with the medical file, medical staff having input into the decision to transfer an inmate and a comprehensive suicide prevention program. However, the evidence shows that at least some of these procedures are imperfect. For example, of the seven inmates whom Dr. Kupers identified as seriously mentally ill during the course of his interviews at Supermax, two did not have Screening Tools in their files, the Screening Tool of one was missing, one had a Screening Tool that was completed one year after his transfer to Supermax and one's form was filled out incorrectly. In addition, the presence of these procedures does not counteract the

incessant isolation and sensory deprivation that inmates endure from week to week.

Other relevant features of the conditions in *Madrid* were far less oppressive than those at Supermax: the cells were not illuminated 24 hours a day; prisoners were allowed more time out of their cells (10½ hours a week instead of 4); prisoners were allowed face-to-face visits; and prisoners who could afford a television or radio were allowed to have one. Nonetheless, the court in *Madrid* held that

> placing [mentally ill inmates and those at increased risk for mental illness] in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk was plainly unreasonable. Such inmates are not required to endure the horrific suffering of a serious mental disorder or major exacerbation of an existing mental illness before obtaining relief.

889 F.Supp. at 1165–66 (citations omitted). The conditions at Supermax are similar to those in *Madrid* in important respects.

Plaintiffs also rely on *Ruiz*, in which the court analyzed the conditions in Texas's administrative segregation units and held that they constituted cruel and unusual conditions of confinement under the Eighth Amendment. *Ruiz*, 37 F.Supp.2d at 913. In the interest of brevity, I note that the conditions were similar in many respects to Supermax: they created an environment in which "inmates' lives are virtually void of property, personal contact, and mental stimulus." *Id.* at 908. Although prisoners were screened before placement in administrative segregation, the plaintiffs demonstrated that mentally ill inmates had been placed there inappropriately and that these were "inmates whose illness can only be exacerbated by the depravity of their confinement." *Id.* at

915. The court found that "[i]n light of the obvious severity of these inmates' needs, it is determined that defendants have been deliberately indifferent to the serious risks posed by subjecting such inmates to confinement in administrative segregation for extended periods of time." *Id.*

In an effort to minimize the deprivation of stimulation at Supermax, defendants allege that the education and self-improvement programs at Supermax are substantial and successful. There is no doubt that inmates who reach Levels Three and above have access to an array of programming. However, most of the identified seriously mentally ill inmates spend the great majority of their time at Levels One and Two, where programming is minimal. In other words, seriously mentally ill inmates do not have access to the programming because they are not able to control their behavior to reach higher levels. With the exception of Prisoner 2, who has had one brief stay on Level Three, the identified seriously mentally ill inmates are stuck on Levels One and Two and cannot benefit from the programming.

Plaintiffs presented credible evidence that the conditions at Supermax surpass those of the typical supermaximum security facility. Kupers has visited supermaximum institutions in Pelican Bay, California (the institution at issue in *Madrid*), Indiana (including the institution at issue in *Bono*), Pennsylvania and Texas. He has never seen the same degree of isolation as that present at Supermax. Nathan has visited dozens of prisons (some of which were supermaximum security institutions) in his capacity as consultant and special monitor. He considers the conditions at Supermax so restrictive and isolating that they "border on barbarism." On the basis of the evidence and testimony, I am convinced that plaintiffs have more than a negligible chance of success in dem-

onstrating that the conditions at Supermax are sufficiently serious.

### 2. *Deliberate indifference*

The Supreme Court has held that deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). If the circumstances suggest that the prison officials were exposed to information about the risk and thus must have known about it, that evidence could be sufficient to allow a trier of fact to find actual knowledge. *Id.* at 842, 114 S.Ct. 1970. The officials can still show that they were unaware of the risk or that they were aware of the risk and took reasonable steps to prevent the risk of harm. *Id.* at 844–45, 114 S.Ct. 1970.

Defendants do not argue that they were unaware of the risks associated with housing mentally ill inmates at Supermax. Indeed, they could not make such an argument: the very facts that defendants have a Mental Health Screening Tool in place and that some mentally ill inmates have been deemed inappropriate for transfer to Supermax indicate that defendants understand that housing mentally ill inmates in such harsh conditions pose significant risks to that population. Because defendants' awareness of the risk is not at issue, I will not discuss it in further detail.

Plaintiffs have shown more than a negligible chance of success of demonstrating that the conditions of confinement at Supermax pose significant risks to seriously mentally ill inmates. Defendants' burden is to demonstrate that they took reasonable steps to keep seriously mentally ill inmates from being transferred to Supermax and to transfer out any inmates who develop serious mental illnesses after their transfer there. Defendants argue that they have attempted to prevent the risk of harm by implementing a three-tiered screening process, through which some mentally ill inmates have been found unsuitable for transfer to Supermax, and by monitoring inmates at Supermax for the onset of mental illness on a routine basis. For the purpose of this motion, I assume that defendants designed or approved the design of the screening tool and the monitoring procedure because they rely upon them as proof of steps that they have taken to prevent the risk to mentally ill inmates.

In relying on the screening process and the monitoring procedure, defendants focus on too narrow a question. The issue is not whether defendants are providing adequate treatment for mentally ill inmates but whether they have taken reasonable steps to prevent the harm that is inflicted upon seriously mentally ill inmates who are housed in the isolating conditions at Supermax. Defendants' screening process is not a reasonable safeguard against housing seriously mentally ill inmates at Supermax because it is not designed to keep seriously mentally ill inmates out of Supermax. By defendants' own admission, inmates with diagnoses of the serious mental illnesses listed under the "restricted movement" category of the Screening Tool are not prohibited from being transferred to Supermax but instead are considered on a case-by-case basis. The screening tool itself demonstrates that placement of certain mentally ill inmates at Supermax could be detrimental: after the diagnosis of Anxiety Disorders listed under the "conditional transfer" category, which is less restrictive than the "restricted movement" category, the form states that "Supermax may exacerbate condition." Nevertheless, the form allows the person completing the assessment to recommend either "appropriate for transfer," "conditional transfer"

or "not appropriate for transfer" without regard to the disorders listed under the various categories. The design of the screening tool is so vague in its criteria for weeding out seriously mentally ill inmates as inappropriate for transfer to Supermax that it amounts to no tool at all.

Moreover, the evidence establishes that the screening tool is ineffective in practice. For example, the Screening Tool for Prisoner 1 notes explicitly that he has been diagnosed with Chronic Paranoid Schizophrenia v. Major Depression with Psychotic Features, yet he was transferred to Supermax nonetheless. The Screening Tool for Prisoner 3 indicates that he has a documented history of chronic or severe mental illness and that he has been hospitalized because of his illness, yet he was transferred to Supermax. Mental Illness Screening Tools (whether the one dated April 2000 or a revised one) are conspicuously missing from the clinical files of Prisoners 6 and 7. The Screening Tool for Prisoner 4 was completed one year after his arrival at Supermax. The Screening Tool for Prisoner 2 notes that he had no prior hospitalizations although his clinical records show that he has been hospitalized for attempted suicide on more than one occasion, with at least one hospitalization while incarcerated in the Department of Corrections. The evidence establishes that the Screening Tool is not designed to keep seriously mentally ill inmates out of Supermax and does not keep seriously mentally ill inmates out of Supermax in practice. Therefore, the screening process is not a reasonable step taken to prevent the risk of harm in sending seriously mentally ill inmates to Supermax.

With respect to defendants' second avenue for preventing the risk of harm (monitoring inmates for mental health problems), the facts are clear that this does nothing to prevent an already mentally ill inmate's *placement* at the institution. Instead, the risk that the use of monitors would be reasonably designed to prevent is the *retention* of inmates at Supermax who develop serious mental illnesses after their placement there. However, the fact that Prisoners 1 through 6 remain at Supermax is a testament to the fact that the mental health staff is not monitoring for the purpose of transferring seriously mentally ill inmates out of the institution. Thus, there is little to defendants' contention that the monitoring constitutes a reasonable effort to prevent the risk of harm of housing mentally ill inmates at Supermax. If the purpose of monitoring is not to identify seriously mentally ill inmates and transfer them from Supermax, all the monitoring in the world would not protect these inmates from the harshly isolating conditions of confinement.

Defendants' screening and monitoring procedures seem to be an attempt to keep some subset of mentally ill inmates out of Supermax (the evidence does not speak to which subset) and to provide treatment to mentally ill inmates housed at Supermax. However, from the testimony and evidence, I find that plaintiffs have demonstrated more than a negligible chance of showing that the very fact of housing any seriously mentally ill inmates at Supermax constitutes cruel and unusual punishment. Defendants' procedures are not designed to keep all inmates with serious mental illnesses out of Supermax. Instead, the Screening Tool and the monitoring serve as little more than band-aids to the potentially detrimental conditions to which defendants are subjecting mentally ill inmates. Defendants were aware of the risks associated with housing mentally ill inmates at Supermax, yet they have made no showing that they investigated the consequences of placing inmates who fall into the "restricted movement" category at Supermax. I conclude that defendants have not demonstrated that they have taken

reasonable steps to prevent the likely risk of harm in housing seriously mentally ill inmates at Supermax.

### C. *Irreparable Harm*

■■ Irreparable harm means that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial. *Vogel v. American Society of Appraisers,* 744 F.2d 598, 599 (7th Cir. 1984). Moreover, the violation of a fundamental constitutional right constitutes irreparable harm, even if temporary. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Put more specifically, pain, suffering and the risk of death constitute "irreparable harm" sufficient to support a preliminary injunction in prison cases. *See, e.g., Von Colln v. County of Ventura,* 189 F.R.D. 583, 598 (C.D.Cal. 1999) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they"); *Arnold v. Lewis,* 803 F.Supp. 246, 255 (D.Ariz.1992) (finding "great likelihood of irreparable harm to [schizophrenic prisoner's] mental health" if she were transferred from mental health facility to prison).

■ Plaintiffs allege that the conditions at Supermax pose a grave risk of harm to seriously mentally ill inmates. These risks include the development of serious mental illness, such as the extreme and bizarre behavior of feces smearing and refusing to eat exhibited by Prisoner 5, and the exacerbation of existing symptoms, such as increased depression, hallucination derealization and acute suicidality. Defendants do not address the lasting psychological damage that the isolating conditions at Supermax may inflict upon inmates there. Defendants also do not address the possibility that the isolating conditions at Supermax are the reason Prisoners 1 through 7 require so much medical attention. Instead, defendants point to the treatment available to mentally ill inmates at Supermax, ignoring plaintiffs' assertion that the conditions at Supermax create or exacerbate the psychosis in the first place. The facts that defendants are providing mental health services (to a disputed degree) and that they have in place procedures for treating suicide risks do not convince me that plaintiffs are not exposed to irreparable harm. I conclude that plaintiffs have no adequate remedy at law and would suffer irreparable harm if the preliminary injunction is not issued.

### D. *Balancing of Harms*

1. *Transfer of seriously mentally ill inmates from Supermax*

Plaintiffs ask that the court order five of the identified prisoners to be transferred out of Supermax on an urgent basis and undergo thorough psychiatric examination in a less stressful mental health treatment setting. Two other prisoners have already been transferred from Supermax to the Wisconsin Resource Center; plaintiffs ask that the court order that they not be transferred back to Supermax. Plaintiffs believe Prisoner 6 should also be transferred to a mental health treatment setting but recognize that he presents special security concerns.

For defendants, the harm that would result from granting plaintiffs' motion is minimal. As Sullivan testified, transfers of inmates occur on a daily basis; movement of inmates is normal. In fact, the Department of Corrections has a transportation unit that is dedicated to this activity. Transferring five prisoners would not burden the department logistically or financially.

Defendants assert that an order from this court requiring the transfer of seriously mentally ill inmates is not the least intrusive means of alleviating the problems the inmates are experiencing. Instead, defendants suggest, increasing the mental

health staff would be a way to lessen the court's interference with prison management. I disagree. I am convinced that the staffing· ratio is not the sole factor making up the potentially damaging conditions for mentally ill inmates; the physical architecture of Supermax and the customs and policies also contribute to the conditions. As the court in *Madrid* stated,

> We are acutely aware that defendants are entitled to substantial deference with respect to their management of the SHU. However, subjecting individuals to conditions that are very likely to render them psychotic or otherwise inflict a serious mental illness or seriously exacerbate an existing mental illness can not be squared with evolving standards of humanity or decency, especially when certain aspects of those conditions appear to bear little relation to security concerns. A risk this grave—this shocking and indecent—simply has no place in civilized society.

*Madrid*, 889 F.Supp. at 1265–66 (citations omitted). The conditions at issue here raise the same concerns as in *Madrid*. Moreover, ordering that defendants increase the amount of mental health staff at Supermax would interfere with prison management more than merely ordering that certain inmates not be housed at Supermax. Although I recognize that defendants should be afforded due deference, I conclude that it does not overstep these bounds to order that Prisoners 1 through 5 not be housed at Supermax.

2. *Evaluation of all Supermax inmates*

Having observed a high degree of psychopathology in the twenty-one prisoners he interviewed, Dr. Kupers believes it is very likely that many more prisoners at Supermax suffer from serious mental illnesses. Plaintiffs ask that the court order an emergency assessment of all prisoners at Supermax to ascertain how many more seriously mentally ill prisoners require mental health services or transfer to a less stressful setting where they can receive the treatment they need. Plaintiffs also ask the court to order additional ongoing monitoring of all prisoners at Supermax on a monthly basis to identify cases of impending psychiatric breakdown. Plaintiffs believe that these mental health assessments must be conducted by mental health professionals who are not employed by the Department of Corrections in an environment that allows privacy for the prisoner and the clinician.

Defendants object to this form of relief for the same reason they object to the request to transfer seriously mentally ill inmates: the court should refrain from interfering in prison management. However, the potential harm to yet unidentified seriously mentally ill inmates is just as detrimental as to those who have already been identified. It follows that all inmates who exhibit some indication of a serious mental illness should be evaluated and transferred to a treatment facility if they are found to be seriously mentally ill. Plaintiffs also ask that the evaluations be performed by mental health professionals who are not employed by the Department of Corrections to insure that the interviews would not be biased. This could be accomplished by enlisting mental health staff from the Wisconsin Resource Center, Mendota Mental Health Institute or the Winnebago Mental Health Institute, all of which are run by the Wisconsin Department of Health and Family Services.

Although plaintiffs have demonstrated for the purpose of this preliminary injunction that seriously mentally ill inmates should not be housed at Supermax, evaluating the entire population of inmates is not necessary. For example, inmates who have reached Levels Four and Five have demonstrated that they are capable of conforming their behavior to the rules; they

are not stuck in the lowest levels of severe isolation and sensory deprivation. Only those inmates at risk of having serious mental illnesses need to be evaluated pursuant to this order: those prescribed psychotropic medications; those who have been hospitalized in a psychiatric institution at any time; those who have spent longer than 30 days at Level One; those who have spent longer than 90 days at Supermax without progressing beyond Level Two; and those who have been placed in the observation unit on suicide watch. If the mental health staff who conduct the evaluations determine that any of these inmates are seriously mentally ill, they should not be housed at Supermax. By ordering the evaluation of these segments of the population only, the court interferes in the management of Supermax to a minimal degree yet casts the net wide enough to catch any seriously mentally ill inmates who are stuck at Supermax because of their disability.

In deference to defendants' independence in prison management, I decline to order the monitoring of Supermax inmates on a monthly basis. This requirement would interfere much more significantly with defendants' management of the institution than a one-time assessment of all inmates. In addition, the purpose of a preliminary injunction, to preserve the status quo, is better met by not requiring defendants to arrange for mental health professionals not employed by the Department of Corrections to conduct monthly evaluations of all inmates, or a subset of inmates. Although I recognize plaintiffs' position that the conditions at Supermax can lead to the gradual deterioration of inmates prone to mental illness, I trust that defendants will take the remainder of this order to heart and will conduct their own monitoring with increased awareness of the adverse effects of the restrictive conditions at Supermax on those who are ill-equipped to adapt to them.

### E. *Public Interest*

"Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest. The public at large is not served by ... the willful or wanton infliction of pain and suffering." *Duran v. Anaya,* 642 F.Supp. 510, 527 (D.N.M.1986). In this case, the public interest is not served by housing seriously mentally ill inmates at Supermax under conditions in which they risk irreparable emotional damage and, in some cases, a risk of death by suicide. Defendants assert that the public has an interest in maintaining safe prison systems, suggesting that the transfer of mentally ill inmates to treatment facilities would jeopardize that safety. However, from the evidence and testimony, particularly that of former Secretary Sullivan, I am convinced that a maximum security facility such as the Wisconsin Resource Center that is designed to serve the prison population is capable of securing mentally ill inmates and treating their illnesses simultaneously. As one court stated, "this Court is bound by law to keep a balance between efficient prison management and keeping prisons a humane place: in this case, there is a glaring need for the latter goal." *Phillips v. Michigan Dept. of Corrections,* 731 F.Supp. 792, 801 (W.D.Mich. 1990). I conclude that the public interest will be served by protecting the Eighth Amendment rights of inmates housed at Supermax.

### ORDER

IT IS ORDERED that

1. Plaintiffs' motion for a preliminary injunction is GRANTED as to their request to require defendants not to house the previously identified seriously mentally ill inmates at Supermax and to evaluate inmates on a one-time basis. Defendants

Gerald Berge and Jon Litscher are directed not to house Prisoners 1, 2, 3, 4 and 5 at Supermax. Defendants are also directed not to return Prisoners 7 and 21, who are not currently at the institution, to Supermax. Further, defendants are directed to arrange for mental health professionals not employed by the Department of Corrections to perform evaluations immediately of the following categories of inmates at Supermax: those prescribed psychotropic medications; those who have been hospitalized in a psychiatric institution at any time; those who have spent longer than 30 days at Level One; those who have spent longer than 90 days at Supermax without progressing beyond Level Two; and those who have been placed in the observation unit on suicide watch. If the mental health professionals determine that any of these inmates are seriously mentally ill, they should not be housed at Supermax Correctional Institution. Defendants may have until November 15, 2001, in which to implement the evaluation of these segments of the population.

2. Plaintiffs' motion for a preliminary injunction is DENIED as to their request to require an ongoing, monthly evaluation of all inmates at Supermax.

3. Plaintiffs' motion to withdraw motion to exclude purported expert opinions is GRANTED.